Anthony LO CICERO et al., Appellants,

v.

COLUMBIA CASUALTY COMPANY, Appellee.

No. 17494.

United States Court of Appeals Fifth Circuit.

June 30, 1959.

Rehearing Denied July 31, 1959.

survivors, sued appellee (defendant below), Columbia Casualty Company, the insurance carrier of the City of New Orleans, alleging that their father was negligently killed. The case was submitted to a jury, which returned a verdict against appellants and in favor of the insurance company.

Appellants seek a reversal on the ground that the verdict was contrary to the law and the evidence; that the court committed specified errors in refusing instructions requested by them, and in charging the jury too favorably to appellee; and on other grounds which it is not necessary to discuss in this opinion. Our decision will be based upon the error of the court in submitting to the jury the question of defendant's negligence vel non instead of, as it should have done, instructing the jury that, under the city ordinance, conditionally exempting emergency vehicles from normal safety observance, and the undisputed evidence of the driver of the police car that he was deliberately and intentionally operating the car without sounding the required siren signal, defendant was, as matter of law, guilty of negligence, and the only issues for the jury's consideration were proximate cause, contributory negligence, and last clear chance.

Robert R. Rainold, New Orleans, La., Baldwin, Haspel, Molony, Rainold & Meyer, Richard C. Baldwin, New Orleans, La., for Anthony Lo Cicero and others, plaintiffs and appellants.

A. J. Waechter, Jr., John V. Baus, New Orleans, La. (Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., of counsel), for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

Anthony Lo Cicero, an elderly gentleman, was struck and fatally injured by a police car answering an emergency call about five o'clock p.m. on Decatur Street in New Orleans, Louisiana. Appellants (plaintiffs below), his children and sole

The facts set forth by appellee as constituting those which it contends the jury was warranted in accepting, are these: "On October 11, 1956, at approximately 5:00 P.M. the police department was notified that there was a holdup in progress at the French Market on Decatur Street. A City of New Orleans police car, driven by Patrolman Conrad, accompanied by Patrolman Cassaro, was immediately dispatched to the scene from the First District police station on Basin Street. With its red flashing dome light turned on, [but because of the holdup alarm siren not sounding] the car proceeded from Basin Street onto Toulouse Street and turned left onto Decatur Street in the direction of the French Market. When the driver of the squad car reached Decatur Street, he noticed that there was a long line of traffic

stopped on Decatur Street for a red signal light at the intersection of Decatur Street with Wilkinson Street. The police car drove to the left of the line of traffic, proceeded to the red traffic light at the intersection of Wilkinson Street and stopped momentarily (or almost stopped), proceeded across the red light, turning back into its right lane of traffic, and then proceeded down Decatur Street toward the French Market on its emergency mission. After having passed the line of stopped traffic and the red signal light at Wilkinson Street, the police vehicle had a clear roadway on Decatur Street to the French Market several blocks away. There was a long line of traffic to the left of the police car on Decatur Street heading in the opposite direction which was stopped for the Wilkinson Street red light. This stopped line of traffic extended past the intersection of Decatur Street and St. Peter Street or a distance of about a block and a half. As the police car entered the intersection of St. Peter Street, the driver saw the plaintiffs' deceased father Mr. Lo Cicero, suddenly emerge from behind the stopped automobiles without looking for approaching traffic, apparently attempting to cross Decatur Street from Jackson Square to the river or from the driver's left to right. Patrolman Conrad slammed on his brakes as soon as Mr. Lo Cicero appeared from behind the parked cars and attempted to avoid striking him. Unfortunately, however, just before the police car came to a stop, it hit Mr. Lo Cicero with its right front headlight. Although the police car was being driven at a speed of between 30 to 35 miles per hour at the time that Mr. Lo Cicero appeared from behind the stopped vehicles, it did not move more than a * * * [few feet after] striking him. The witnesses closest to the scene of the accident placed the location of the accident at about 40 to 50 feet beyond the intersection of Decatur and St. Peter Streets."

Appellants' evidence developed quite a different case. According to their proof, Decatur Street, 51.5 feet wide, ran substantially north and south and was used by traffic as a two-way street. It was intersected at right angles by St. Peter Street and by Wilkinson Street 165.38 feet to the south. The decedent approached Decatur walking east along St. Peter and found a line of vehicular traffic on the west side of the street, all vehicles being stationary in obedience to the red traffic light at Wilkinson Street. He passed between two of these vehicles and looked in both directions observing no traffic in movement and, without the benefit of siren signal, which was deliberately not being sounded, he began at a normal pace to cross Decatur angling somewhat north of the east and west course of St. Peter. The red traffic light at Wilkinson was in clear view and its protective assurance extended to decedent on St. Peter. After crossing approximately 43 feet of the intersection, he had reached a point substantially 8.5 feet from the east curb of Decatur when he was struck by a New Orleans police car, which had skidded 58 feet before striking him.

The police car had proceeded in the west or left lane of Decatur until it reached Wilkinson and was obscured from decedent's view by the unbroken line of immobilized motor vehicles extending from Wilkinson to and beyond where decedent entered it at St. Peter. The automobile made an "S" turn as it crossed Wilkinson in order to pass from the left to the right side of the street and take advantage of the unoccupied traffic lanes resulting from the red light. The point where he was struck was about 17 feet east of the center line of Decatur. Assuming that the automobile was being driven at a speed of 30 miles per hour, it was traveling 44 feet per second; and assuming that decedent was walking 4 miles per hour, he would have moved 5.03 feet per second. In other words, the police car was traveling approximately eight times as fast as decedent.

Both parties in effect concede that in view of the refusal of the driver to sound the siren, the crucial point in the case is the application and effect of the City

Code Section of New Orleans regulating emergency vehicles,[1] the pertinent portion reading:

"The provisions of this chapter regulating the operation, parking and standing of vehicles shall apply to authorized emergency vehicles, as defined in this article, except as follows:

"A driver when operating any such vehicle in an emergency * * may * * * (2) proceed past a red or stop signal or stop sign, but only after slowing down to the extent necessary for safe operation; and

"(3) Exceed the prima facie speed limit so long as he does not endanger life or property.

"The foregoing exemption granted in reference to the movement of an authorized emergency vehicle shall *apply only when the driver of such vehicle sounds a siren, bell or exhaust whistle to the extent reasonably necessary* and the vehicle displays a lighted red lamp visible from the front as a warning to others. This shall not, however, protect the driver of any such vehicle from the consequences of a reckless disregard of the safety of others." (Emphasis added.)

The italicized words apply to the driver of the vehicle involved and permit him to exceed the speed limit, run on the left side of the street, violate red lights, etc., only when he sounds a siren to the extent reasonably necessary. That means that the duty varies from second to second dependent upon the conditions with which the driver is faced. This police car was being operated at substantially the time when the "five o'clock traffic" was cluttering almost all streets and in addition when employees of a nearby manufacturing plant were leaving in the haste which generally attends those eager to get home or to a refreshing drink following a day's work.

The duties laid upon the driver of an emergency vehicle by this ordinance are exacting and require fast thinking, close and constant attention, speedy reactions and calm, quick judgment, uninfluenced by any factor except consideration of the public safety. Under its explicit terms, the right to ignore the safeguards which pedestrians habitually and instinctively rely upon in making their hazardous way through the mazes of motor vehicles which confront them at every hand, is a conditional privilege, hedged in by such phrases as "to the extent necessary for safe operation" and "so long as he does not endanger life or property." A reasonable construction of the ordinance would not permit these safeguards so clearly imposed upon the driver to be dispensed with by him either of his own motion or on orders from his superiors.

In the court below appellee, realizing the strong impact as a matter of law of the testimony of the driver, that, because of the nature of the police call then being answered, he had deliberately done away with the safeguards which alone justified emergency driving and as a result had illegally subjected all persons and traffic on the street to great peril, sought to introduce evidence tending to show that these safeguards placed upon the driver had, because of the nature of the call, been abrogated by orders from his superiors and the driver was not therefore at fault. The proffer was made while Officer Cassaro, one of the occupants of the police car, was being questioned by appellee's attorney. After testifying positively that the siren was not being operated, he explained its deliberate nonoperation in this way, that he was answering a holdup call, which is a rare call, and if they had used the siren, "it can be heard all over the French Market area, because it is a small area, and whoever was committing the holdup would hear it and normally would naturally leave right away." This statement demonstrating that the officer was giving

1. Motor Vehicle and Traffic Ordinances of the City of New Orleans, Chapter 38 of the Code of 1956, § 38–37.

primary consideration, not to the safety of the public on the streets but the desirability of catching those who were committing the crime, appellee's counsel endeavored to exculpate him from his admitted fault by showing that the portion of the ordinance requiring the driver to drive so as not to endanger life or property had in effect been nullified so that the driver was excused by the action of his superiors in instructing drivers to omit using the siren when answering holdup calls.[2]

Appellants objected to this proffer on the ground that the driver's superiors cannot contravene the Code of New Orleans relative to the emergency operation of motor vehicles, and the court, stating in effect that neither the driver nor his superiors had authority to suspend or vary the ordinance correctly sustained the objection.

▰▰ This, we think, was a manifestly correct ruling, and the court's attention having been directly called to the admitted fault of the driver in willfully violating the ordinance, it was plain error not to charge the jury directly that the driver was negligent. As stated, the ordinance laid the duty upon the driver to do what was reasonably required in the interest of safety at every moment and under all conditions. The ordinance made no exception in the case of holdups. If, as counsel was seeking to prove, the driver's superiors had taken away from him the right and duty to use judgment fitting the particular emergency and to act for the protection of human life by the use of the siren, they had in effect repealed the ordinance, or at least, in effect, rendered it sterile. The genius of the ordinance was to place human life above such activities as intercepting those who had forcibly set upon others to take their money or property. The proof tendered in attempted justification of the admittedly open violation of the ordinance would, if it had been accepted as an excuse, operate to shut off the use of all sirens when cars were engaged in such a mission. This would be in contravention of the ordinance and would in fact amount to a defiance of its terms. It would be difficult to overestimate the importance of such proof. Anyone who has grown accustomed to the repeated and persistent wail of sirens of emergency vehicles going through the streets of New Orleans and other cities would know instinctively that the average pedestrian relies upon being warned of approaching danger by a siren—a much more challenging and efficacious means of warning than flashing lights.

It is true that the plaintiff did not except to the charge for failure to instruct that the defendant was guilty of negligence as matter of law in failing to sound the siren or give other audible signal, nor request a charge of his own to that effect. Under the circumstances, however, revealed by the evidence in this case, including the undisputed proof of the driver that he was violating the ordinance, it was plain error not so to instruct the jury. Appellants in their brief make this quite clear. Arguing that failure of the police car to sound a siren, horn or other audible signal was a major cause of the accident, the appellants point out that the mere sounding of the siren or blowing of the horn could have easily been heard 315 feet away at the intersection of St. Peter Street and certainly, if the horn had been sounded or the siren blown, as the police vehicle reached Wilkinson Street, some 165 feet from St. Peter Street, the pedestrian

---

**2.** "Q. Did you have instructions from your superiors—rather, please state whether or not you had instructions from your superiors when going to a holdup in progress that you should not use the siren?"

Mr. Rainold: "I object to any instructions from his superiors because that cannot contradict the Code of New Orleans relative to emergency operation.

\* \* \* that cannot contravene the Code of the City of New Orleans relative to the operation of motor vehicle or emergency vehicles."

The Court: "I'll sustain the objection. The point is this, Mr. Waechter, that if the instructions are negligent, then the liability is the same. \* \* \*"

could undoubtedly have heard the horn and taken measures to protect himself.

For the failure of the district court to instruct the jury that defendant was guilty of negligence as matter of law and to submit to it, therefore, only the issues of proximate cause, contributory negligence, and last clear chance, the judgment is Reversed and the cause is Remanded for a new trial consistent with the views above expressed.

Reversed and remanded.