JOHN H. FAULK, Plaintiff, v. AWARE, INC., et al., Defendants.

Supreme Court, Special and Trial Term, New York County, July 10, 1962.

*Phillips, Nizer, Benjamin, Krim & Ballon* (*Louis Nizer, Paul Martinson* and *George Berger* of counsel), for plaintiff. *Saxe, Bacon & O'Shea* (*Thomas A. Bolan* and *John F. Lang* of counsel), for defendants. *Harry G. Liese* as temporary administrator of estate of Laurence A. Johnson, deceased.

ABRAHAM N. GELLER, J.  In this libel action the jury rendered a verdict awarding compensatory damages of $1,000,000 against the three defendants and punitive damages of $1,250,000 each against defendants *Aware, Inc.,* and Vincent Hartnett.

In view of the death prior to verdict of the third defendant, Laurence A. Johnson, punitive damages could not be awarded against him.  But, since he died after the close of all the evidence in this long trial, his death presumably having occurred during the night following the summation of counsel representing all the defendants and not reported to the court until near the end of plaintiff's summation, the action, insofar as compensatory damages is concerned, was continued against a temporary administrator of his estate appointed by the court.  (The problem created by the death of Laurence A. Johnson and its resolution by the adoption of procedures designed to protect the rights of all the parties, are discussed at the foot of this opinion.)

The motions of all defendants, including the temporary administrator of the deceased Johnson, to set aside the verdict as contrary to law and against the weight of the evidence were denied.  The court, however, reserved decision on their motions to set aside the verdict on the ground of excessiveness.  After due consideration of all the relevant factors, the court herewith sets forth its decision together with a statement of its reasons.

It should be noted that these motions were made pursuant to section 549 of the Civil Practice Act for a new trial upon the grounds stated. If the court were to hold the verdict excessive, the usual practice would be to direct a new trial, unless the plaintiff consented to judgment in such reduced amount as the court would fix as the maximum allowable recovery.

The fact that the amounts awarded are very large does not necessarily render the verdict excessive as a matter of law. The question is whether there is a rational basis for the jury's awards in the evidence adduced and in the circumstances of this case. The court should not substitute its judgment for that of the jury, unless the amounts awarded are insupportable under any fair-minded view of the facts.

It has been said that the amount of damages in an action for libel is "peculiarly within the province of the jury" (*Holmes* v. *Jones*, 147 N. Y. 59, 61); that the actual damages "can rarely be computed" (*Tillotson* v. *Cheetham*, 3 Johns. 56, 63); and that "in the nature of things such proof is almost impossible" (Seelman, The Law of Libel and Slander in the State of New York, par. 332, p. 323). In *Lynch* v. *New York Times Co.* (171 App. Div. 399, 401) the court pointed out: "In a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages. In actions for other torts there is generally to be found some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part."

However, since an award of damages always rests in the "sound discretion" of a jury, it is subject to court review. That discretion must be exercised in accordance with the applicable rules of law and on the basis of the evidence in the case.

The damages recoverable for a libel consist of two items:

(1) *Compensatory* damages, to compensate and make reparation in full for all the damage suffered by a plaintiff as the result and consequence thereof, so that a defamed person is entitled to be compensated for the injury to his reputation and standing publicly, privately and professionally; for his mental anguish and distress, his feeling of mortification and suffering, in his private as well as public life; and for loss of income or earnings.

(2) *Punitive* (exemplary) damages, which may be awarded in a jury's discretion in addition to compensatory damages only

in certain actions of willful torts such as libel and assault, provided the jury finds malice on the part of a defendant or such reckless and wanton indifference to the rights of others as is deemed in law the equivalent of malice; punitive damages are authorized under the law as a penalty to punish such a defendant, to deter him from a repetition of the offense and to warn others of like mind from perpetrating similar wrongs.

We will consider each of these two types of awards separately, just as the jury was instructed to do in its deliberations and form of verdict.

## I. COMPENSATORY DAMAGES

In his opening to the jury, plaintiff's counsel informed them that the amount demanded was $1,000,000 compensatory damages and such amount of punitive damages as the jury might award.

In its outline to the jury of the rules of law governing damages in libel actions — as pointed out in Fisch, New York Evidence (§ 1346) to help the jury intelligently absorb the evidence in this extremely long trial, the court instructed them as to the legal elements applicable to a particular subject as it was being presented as well as in the integrated charge at the end of the case — the court cautioned them regarding the amount demanded, saying: " A final word on the general subject of damages. Naturally, the amount that a plaintiff may insert in his complaint as his estimate of his damages should have no significance to a jury. His demand for judgment is completely immaterial. It is the evidence upon which a jury must base its award, and use its own judgment in fixing the amount if, of course, it finds that plaintiff is entitled to recover any amount, and this determination by the jury is to be made irrespective and without any consideration of the amount which plaintiff may be asking." And on several occasions the court was careful to point out to the jury: " So you understand that merely because I am now making reference to damages, not for a split second should you infer therefrom that I feel that the plaintiff is entitled to damages, because I would then be usurping your responsibility as judges of the facts."

Although the jury did award $1,000,000 in compensatory damages, the amount demanded, its determination cannot be said to be without substantial support in the evidence.

The principal item of damages was plaintiff's claim that he had been rendered unemployable in the television and radio industry as the direct result of the alleged libel and the concerted acts of the defendants, depriving him of the opportunity to realize his earning capacities in his profession.

As evidence bearing on that issue was offered through the testimony of plaintiff and his witnesses, the court instructed the jury that " it will be for you, the jury, when all the evidence is in, to decide what was the reason or cause for the failure of the plaintiff to obtain employment, and to decide whether it was the direct and connected result of the defendants' alleged libel and acts, and not because of some other reason." And in the final charge the jury was again reminded: " But you must be satisfied from all the evidence that the damages you award represent the injury to plaintiff caused by the wrongful act and not from any other cause."

Furthermore, the court instructed the jury, with similar reminders and recapitulation in the charge, that " you may not speculate as to plaintiff's future after this trial, but we are concerned on the question of damages only with the period up to the date of this trial."

There was substantial testimony, which was uncontradicted, that prior to the alleged libel in February, 1956, plaintiff, in addition to his regular radio show, had appeared on a large number of television programs and had shown particular talent for that medium, being especially suited for the game, fun and quiz shows which were extremely popular during the period here involved. There also was uncontradicted testimony of an upward trend during this period in the television industry and in the income earned by television performers.

Plaintiff offered proof of his earning capacity through experts in the industry familiar with his achievements and abilities, among whom were Mark Goodson, David Susskind and Gary Moore, well-known producers of television shows.

It is well settled that a person wrongfully injured is entitled to recover for deprivation of future earning capacity, without limitation to his actual earnings preceding the injury; and that opinion testimony with regard to his potential earnings in that field by experts familiar with his capacities, is admissible (*Grayson* v. *Irvmar Realty Corp.*, 7 A D 2d 436; see, also, *Geary* v. *Metropolitan St. Ry. Co.*, 73 App. Div. 441; and *Metz* v. *Great Atlantic & Pacific Tea Co.*, 30 Misc 2d 258).

When expert testimony along these lines was offered by plaintiff, the jury was instructed as to how to consider it, and reminded again in the charge: " The testimony of an expert is not to be accepted or rejected at will, but is to be weighed and considered by you in the same manner as the testimony of other witnesses, and to be given such weight as in the exercise of your best judgment you believe it is well-founded, reasonable,

consistent with all the testimony in the case, and justly deserves.''

The court here was careful to point out the standards and cautions regarding such evidence set forth in *Grayson* v. *Irvmar Realty Corp.* (*supra*): '' Such opinion testimony as to plaintiff's earning capacity may be given by qualified and experienced persons in that industry, based on their knowledge of his abilities, performances and recognition in that industry, and their opinion as to the prospects and opportunities available to him during these past several years, and as to his earning capacity during that period. The jury may, in weighing that testimony, take into consideration the fact that not all men reach the highest potential in earning capacity of their abilities, and that there are risks which may prevent complete fulfillment. Someone may have great potential possibilities but there may be other intervening factors which prevent one from reaching it, fulfilling his greatest capabilities.'' And at another point when similar testimony was offered: '' take into consideration that only a few individuals succeed in realizing such potential, and that there are risks which may prevent them in the ordinary course of events. * * * The jury must keep in mind that none of such opportunities as to future earning capacity is to be considered by them unless they find from the facts or reasonable inferences to be drawn from the facts that the plaintiff's deprivation or loss of future earning capacity was the proximate result of the alleged libel and was not attributable to any other cause. In fact, with regard to any item of claimed damage, the jury must be satisfied that it was the direct and connected result of the alleged libel.''

Since such expert testimony as to plaintiff's earning capacity was admissible in evidence and the jury given appropriate instructions in line with authoritative precedent, it must follow that they had the right to consider it in fixing compensatory damages.

The testimony of plaintiff's expert witnesses was that he would have earned during the period involved a minimum of $150,000 a year, that television performers of his type, naming them, were earning from $150,000 to $1,000,000 annually, in addition to incidental outside income. They testified that he would have earned between $150,000 and $500,000 annually, giving the reasons for their opinion. Defendants offered no proof in contradiction of plaintiff's experts.

The minimal figure of plaintiff's experts would represent damages of $900,000 for the six years involved. Assuming that

the jury accepted that figure, they could take into consideration the other elements of injury to plaintiff's reputation and his mental anguish and distress in public and private life arising from the nature of the charge made against him, and find basis for arriving at compensatory damages in the sum of $1,000,000.

There are other approaches to the determination of this sum as compensatory damages which the jury could reasonably have used. It could have found a smaller loss of potential earnings and a larger general damage for injury to reputation and feelings, and still arrived at the same sum. Or it could have found that plaintiff's earnings would have accelerated during the course of the six years, and that his total earnings for the period added to the elements of general damages amounted to that sum. Indeed, the jury might even have arrived at a larger total sum than $1,000,000 on the basis of the median figures of plaintiff's probable earnings given by each of the experts; but, knowing that the award for *compensatory* damages could not exceed the sum demanded by plaintiff (which may be implied from its question as to whether *punitive* damages could be awarded in a sum larger than that requested by plaintiff), it brought in a verdict of compensatory damages in the sum demanded. But, in any event, there was substantial evidence in the record to support that award.

Of course, where an estimate is to be made of an artist's or actor's earning capacity during a period when he is prevented from performing, the law deals with probabilities, not certainties, and there may well be divergent views and varying estimates. But, from the nature of things it is impossible to submit for a jury's consideration any better proof than testimony of established experts familiar with the conditions of that industry and the capacities and achievements of that artist or actor.

Assessment of damages in such a matter is peculiarly within the province of a jury and, so long as it has a rational basis in the evidence, its verdict should not be disturbed.

The motions of all defendants to set aside the verdict with respect to compensatory damages are accordingly denied.

## II. Punitive Damages

Although the complaint in this action alleges malice on the part of defendants, there is no reference therein to punitive damages. The law does not require a plaintiff to specify or, even, demand punitive damages. It is entirely in the discretion of the jury whether punitive damages shall be added to compensatory damages.

In *Korber* v. *Dime Sav. Bank of Brooklyn* (134 App. Div. 149) the court said: " It is for the learned trial judge in actions of torts to instruct the jury that they may add exemplary damages, or smart money, if the tort was malicious. It is not necessary that the complaint specifically ask therefor ". In *Gill* v. *Montgomery Ward & Co.* (284 App. Div. 36, 40) where the complaint contained no prayer for punitive damages, the court held: " If the complaint charges that the defendant acted with malice and willfullness, it is sufficient to authorize the jury to award punitive damages."

Plaintiff's counsel in his summation asked the jury to bring in punitive damages of $1,000,000 each against the defendants.

In view of Johnson's sudden death, it was necessary to instruct the jury as to the law that, while any liability for compensatory damages, if found by them, would be chargeable against his estate, punitive damages could not be assessed against a deceased defendant; and to make clear to them that each of the other two defendants could be charged with punitive damages only on the basis of his or its own participation and intent. That was fully explained to the jury not only in a statement before the charge proper, when the jury was informed of Johnson's death, but repeated and restated in the charge itself. The court was careful not merely to state the rule concerning a deceased defendant, but to explain it in lay terms. Toward the end of its charge the court reminded the jury: " Now, keep in mind that punitive damages may not be assessed, because of his death, against Johnson's estate; that on this matter of punitive damages, you will consider only the question as to whether, in your discretion, Aware, Inc. and Hartnett should be charged with punitive damages, and the extent thereof, if you so find. Naturally, in considering the question of punitive damages, you must consider only such evidence as you find to be connected with that particular defendant, and you are not to consider anything bearing on this subject of Johnson's personal malice or intent. In other words, you are not to impute either to Aware, Inc. or Hartnett any malice or recklessness which you might have found on the part of Johnson personally, if he were still alive and a defendant personally."

After deliberating for several hours, the jury submitted the following note, signed by the foreman: " The jury would like to have a clarification on the subject of awards for punitive damages — Is the jury allowed to award more than the amounts requested by the plaintiff?"

The jury was brought back into the courtroom, the note was read and the following answer, to which no objection was taken by any party, was given and then repeated by the court:

" The jury should weigh carefully the requested amount of punitive damages stated in summation by plaintiff's counsel, although you are not bound by it. But, in any event, and this I emphasize, the jury may not, because of Johnson's death, increase the amount of punitive damages which they would have awarded as against Aware, Inc. or Hartnett; or, in other words, in awarding punitive damages, fix such amount as represents your estimate of the proper amount according to the degree of malice, intent or recklessness of that particular defendant only, that is, Aware, Inc. and Hartnett; with a separate award for punitive damages, which may be the same or a different amount as to each of them, as you determine.

" I hope this answers your question fully and clearly. If you want any other questions answered on this or any other subject, please write it out, as I want to make certain that you are fully informed."

About an hour later the jury returned and rendered its verdict, assessing punitive damages of $1,250,000 each against defendants *Aware, Inc.,* and Vincent Hartnett.

There was substantial evidence from which the jury could find malice, intent to injure plaintiff pursuant to concerted plan and conspiracy, and reckless disregard of the rights of others on the part of both Hartnett and *Aware, Inc.* The jury could have determined that, as charged by plaintiff, the attack upon him was not an isolated transaction but was deliberately prepared to end his broadcasting career, to remove his opposition as an officer of AFTRA to the blacklisting practices which these defendants were directly interested in having continued, and to make an example of him.

The evidence revealed that Hartnett had increased considerably his earnings from his occupation as a paid " consultant " on alleged Communist " infiltration " in the radio and television industry, and the jury could have determined that, with the aid of his associates in that purported undertaking, he had acted dictatorially and exerted pressure in blacklisting all categories of personnel in the industry, indiscriminately and without any reason being given to the persons whose livelihoods were thereby placed in jeopardy.

The jury could also have concluded from the evidence that *Aware, Inc.,* was an instrumentality of the group which exerted pressure on the industry to induce the blacklisting of personnel; that it had interfered in and dominated AFTRA for many years;

and that its practices indicated a reckless disregard of the rights of others and an abuse of the right of free speech and press.

Clearly, the jury's determination to impose substantial punitive damages against these two defendants was justified under such a view of the evidence and the circumstances of this case. The only question is as to the amount. Obviously, there can be no standard for measuring punitive damages. It is only when the award is clearly disproportionate to the offense that a jury's assessment is subject to review.

The full extent and nature of these defendants' designs, methods and practices, their impact throughout the radio and television industry, and their effect upon the livelihoods of many persons, can be properly assessed only by those cognizant of the entire record revealed during this long trial.

The jury's function in assessing punitive damages is "to vindicate public decency" (Seelman, *op. cit. supra,* par. 344, p. 333). This unprecedented award was evidently intended to express the conscience of the community, represented by this jury composed of men and women of different walks of life, varied educational backgrounds and economic status, concerning a matter of fundamental rights deemed of great importance to the general public and to the country. On such an issue I believe that a jury's composite assessment more accurately reflects the sense of decency and moral values of the community than the estimate of an individual Judge.

It seems to the court that it was the jury's purpose that this large award, even if it were not collectible, should stand as a warning to " others who might otherwise be so prompted, from indulging in similar conduct in the future " (*Walker* v. *Sheldon,* 10 N Y 2d 401, 404).

In *Walker* v. *Sheldon* (*supra*) the Court of Appeals broke with precedent and permitted the plaintiff in a fraud case for the first time to claim punitive damages in excess of his own actual loss, where he charged that defendant operated a business which defrauded the general public. Its statement of principles in justification of a claim for punitive damages far beyond a plaintiff's own damages is particularly appropriate here.

In libel suits, of course, punitive damages have always been permitted in the discretion of the jury. The assessment of a penalty involves not only a consideration of the nature and degree of the offense, but the higher moral consideration that it may serve as a deterrent to antisocial practices where the public welfare is involved. The jury, representing the community, assesses such a penalty as, in its view, is adequate to stop the practices of defendants and others having similar designs.

Taking into consideration the fundamental issues of this case, the nature of the evidence, and the jury's undoubted conclusions and intentions, the court will not disturb its assessment of punitive damages, and the motions addressed to punitive damages on the ground of excessiveness are accordingly denied.

NOTE—PROCEDURE TO RESOLVE PROBLEM OF JOHNSON'S DEATH

Defendant Johnson died after all parties had rested and, presumably, after his counsel had summed up. This jury trial was then in its 11th week.

Section 478 of the Civil Practice Act provides that a verdict against a party who dies before it is rendered is void. Thus, there could be no verdict in this case against Johnson, unless there was a substitution in his place of an executor or administrator of his estate.

Section 118 of the Decedent Estate Law provides that no cause of action for injury to person shall be lost because of the death of the person liable; that the action may be brought or continued against the executor or administrator of the deceased person; but that punitive damages shall not be awarded in such case.

In *Cullom* v. *Kadel* (208 Misc. 18) the court granted a motion to substitute executors of deceased defendants in a libel action, stating that plaintiff's demands were thereupon to be limited as to the deceased defendants to compensatory damages.

Counsel for all defendants in this case moved for a severance of the action as to defendant Johnson and that the remainder of the proceedings continue only as against the other two defendants. Plaintiff's counsel applied to the court for the appointment of a temporary administrator of the deceased Johnson to be substituted in his place.

Research failed to reveal any direct precedent, and none has come to light even now. But the court was and is persuaded that in this *sui generis* situation the procedure adopted is not without authority and is logical, practical and protective of the rights of all parties.

Substitution before trial of an executor or administrator poses no problem. Nor would there be any problem if a defendant died during a nonjury trial, as the trial could be adjourned, to be continued against his representative after appointment and substitution, all prior proceedings being "valid and operative" (*Moore* v. *Hamilton*, 44 N. Y. 666, 673). In a jury trial, however, a long adjournment cannot as a practical matter be taken to allow for probate of a will, qualification of the executor, and his substitution in the action.

But special circumstances existed here which called for special measures. No substantial rights of Johnson's estate could be adversely affected, since all parties had rested and his counsel had summed up, and provision could be made to allow the estate exceptions to the court's entire charge and all motions addressed to the jury's verdict, if unfavorable. The trial had lasted more than 10 weeks, and a complete retrial against Johnson's estate after a severance would undoubtedly be a tremendous burden to the plaintiff and Johnson's executor, as well as the court, and a great expense to the State and the city.

Moreover, it is the fundamental policy of the courts to avoid circuity and multiplicity of actions and trials wherever possible and where it can be done without prejudice to a substantial right (*Kasen* v. *Morrell*, 11 A D 2d 1050). In *Kasen* the motion of a deceased tort-feasor's executor for a severance was denied.

In order to continue the proceedings as against Johnson, it was essential that an executor or administrator be appointed and then substituted in his place. Obviously, for the purposes of this jury trial, that could not be done, in accordance with the usual practice, through the Surrogate's Court. To complete this trial the appointment of a temporary administrator would have to be made by this court.

The primary question, then, was whether this court has such jurisdiction. The Supreme Court is a court of general jurisdiction and may exercise jurisdiction in many matters where the Surrogate's Court also has jurisdiction (*Matter of Malloy*, 278 N. Y. 429). The Supreme Court will take and retain jurisdiction of a cause in which the Surrogate's Court has concurrent jurisdiction where special circumstances require it (*Noll* v. *Rupprecht*, 256 App. Div. 926, affd. 282 N. Y. 598; *Doscher* v. *Murphy*, 261 App. Div. 263; *Lazzarini* v. *Trapani*, 10 Misc 2d 985).

Since special circumstances do require the exercise of such jurisdiction, and inasmuch as there is no prejudice to any substantial right of Johnson's estate, the court decided to exercise it by means of an appointment of a temporary administrator of his estate, with comprehensive provisions for securing the rights of all parties not only for the remainder of the proceedings in this court but also for purposes of appeal. The entire matter was explored and argued on the record during the time intervening between plaintiff's summation and the court's charge.

The appointment was made by decree upon the petition of plaintiff as a creditor or claimant, as authorized by law. The court offered the appointment to defendant's counsel or to anyone of his selection, but this was refused. Letters of temporary administration of the estate of Laurence A. Johnson, deceased,

were then signed and issued to an attorney of this city appointed by the court, who duly qualified by signing and filing the customary oath and designation. The court then signed an order of substitution. The temporary administrator thereafter appeared in the proceedings, took exceptions to each and every part of the charge affecting Johnson (with the court's permission) and made all motions addressed to the verdict, to protect the record on his behalf. It will be noted that the temporary administrator does not have power to take any of the assets of the estate into his possession but was appointed solely to protect the rights of defendant Johnson in this action and to defend it on behalf of the estate. The executor of the estate of Johnson, when he is appointed and qualifies, may, of course, be substituted to take over the appeal (which the temporary administrator will prosecute promptly after the entry of judgment) and any further proceedings herein.

This procedure was adopted to meet an emergency, to preserve the *status quo* and to protect the rights of all parties until the Appellate Division could, with adequate time at its disposal, decide the question. Since a Justice of the Supreme Court does not have power to stay execution of a judgment for a sum of money without security for more than 30 days (Civ. Prac. Act, § 615), the court required, as a condition to the granting of plaintiff's application, his consent to a stay of execution of any judgment recovered against all the defendants until October 1, 1962, by which time appropriate relief would be obtainable from the Appellate Division. That consent was given on the record. The court observed that an appeal on an abbreviated record could be presented in that time on this question of the appointment of a temporary administrator and his substitution.

If it be held that this court did not have the power to so appoint and proceed or that the proceedings taken constituted an improper exercise of discretion, the judgment as against the temporary administrator will be reversed and the severance requested by defendants' counsel will then be ordered. No prejudice to the estate of Johnson would have resulted from the action taken.

Nor was there any prejudice to the other two defendants. The court's charge as to the relationship of the defendants, their several liabilities, if any, and the separate and individual consideration of punitive damages solely as against *Aware, Inc.*, and Hartnett, wold have been substantially the same had there been a severance and a continuance of the trial only as against them. *Aware, Inc.*, and Hartnett cannot be said to have been adversely affected by the continuance of the action as against the tempo-

rary administrator of Johnson's estate, since under the severance, they requested, the jury would have been similarly instructed and no doubt would have rendered the same verdict.

However, had the court severed the action as to Johnson, plaintiff would have been prejudiced if his application should properly have been granted. A denial of plaintiff's application would have left him without recourse, even if he was correct. A severance would have precluded plaintiff from having this procedural matter passed on by the appellate courts and would have required, even if plaintiff's application was authorized and justified, a complete retrial as to Johnson. The expense and waste of such a procedure is obvious.

The procedure thus adopted in the interests of justice and in harmony with the fundamental principle that circuitry and multiplicity of actions and trials should be avoided where no substantial rights are affected, represents a balancing of the rights of all the parties with complete protection of such rights on appeal from this determination as well as on the whole case.