KATHRYN ZANINOVICH et al., as Executors of LOIS STOREY and RICHARD STOREY, Deceased, Respondents, v. AMERICAN AIRLINES, INC., Appellant, et al., Defendants.

First Department, June 30, 1966.

*John G. Reilly* of counsel (*Robert F. Ewald* with him on the brief; *Bigham, Englar, Jones & Houston,* attorneys), for appellant.

*Charles F. Krause* of counsel (*Eugene M. Partner* and *Stuart M. Speiser* with him on the brief; *Bernstein, Weiss, Hammer & Parter* and *Speiser, Shumate, Geoghan & Krause,* attorneys), for respondents.

BREITEL, J. P.  In a wrongful death action arising from an airplane crash, plaintiffs, as executors of the deceased, recovered a jury verdict against the operating airline of $550,000 for the loss of the father, $200,000 for the loss of the mother, and $5,000 for funeral expenses.  With costs, and interest allowable in death actions, the judgment, as of July 28, 1965, aggregated $909,859.

There were separate jury trials before different trial justices on the issues of liability and damages.  The liability trial was a joint one of 7 cases, the remainder of 16 arising out of the same accident and orginally directed for joint liability trial.  The others had been settled.  Defendant settled three of the damage cases prior to trial.  Of the four damage cases that went to trial three verdicts were returned and eventually paid in full or by settlement.  The present case is the last that remains in litigation.

Defendant assigns errors in both the liability and damage trials and contends that the verdict was excessive.  It is concluded that there were no prejudicial errors, in the sense that, but for the alleged errors, the result would have been different.  On the other hand the verdict is grossly excessive and a new trial should be ordered unless plaintiffs stipulate to accept the lesser amounts discussed below.  It is only necessary to discuss some of the errors assigned and to consider the amounts included in the verdict.

Defendant's airplane crashed into Jamaica Bay two minutes after take-off from New York International Airport on March 1, 1962.  All on board were killed, passengers and crew.  This action involves two passengers, husband and wife, 29 and 28 years of age respectively, who were the parents of four daughters, aged 7, 5 and 2½ years and the youngest 7 months old.  The two-and-a-half-year-old is mongoloid.  The young man had gone into his father-in-law's business, and on the latter's death had acquired a 40% interest against the young man's

unpaid promissory note for $30,000 in favor of his mother-in-law. At his death this decedent was earning just under $15,000 per year. The business was a fruit and produce business with offices in New York City and California. The wife was a housewife. Except for a mortgaged home they had no substantial accumulated assets.

On the liability trial defendant assigns as error the court's tolerance of plaintiffs' contention and theory that the action was based on the doctrine of *res ipsa loquitur* against the operating airline at the same time that plaintiffs were permitted to prove and argue a specific cause of the accident. Plaintiffs have always contended and argued to court and jury that the action was based upon *res ipsa loquitur*. They also offered, however, the testimony of an eyewitness, skilled in aircraft, that defendant's jet plane banked to an excessive degree as it turned, also to an excessive degree, before the plane had attained altitude and speed to support such a maneuver. Another witness testified that the wing flaps were not down or extended, thus increasing the risk of stalling the plane as a result of the stall-inducing bank and turn at that altitude and speed. The stalling of a plane was defined as the incapacity of the lift on the wings to sustain the plane in flight. Throughout the case and in summation plaintiffs argued that this evidence was available to explain the accident but was not sufficiently explanatory or complete to account for the accident, and therefore did not require an election to rely either on *res ipsa loquitur* or proof of specific cause of accident. Moreover, the court's charge reflected and commingled both the doctrine and the proof of specific cause of the accident, although it purported to separate such proof and limit its application.

The New York rule appears to be quite clear and settled that a plaintiff must elect whether he relies on *res ipsa loquitur* or proof of specific cause of accident (*Bressler* v. *New York R. T. Corp.*, 270 N. Y. 409, 413; *Cunningham* v. *Lence Lanes*, 25 A D 2d 238; *Goodheart* v. *American Airlines*, 252 App. Div. 660, 662–663; 41 N. Y. Jur., Negligence, § 93). Because the doctrine is simply a formulation of a species of circumstantial evidence it has involved grave logical difficulties in trying to separate the type of case where plaintiff offers less circumstances to establish defendant's liability from that where he offers more but, still being uncertain of his ground, declines to elect reliance between the doctrine and his specific proof (see, e.g., Anno.—Aviation Accidents—Res Ipsa Loquitur, 6 ALR 2d 528, 536–537). For this reason, among others, the requirements of election has been criticized (Prosser, Torts [3d ed.], p. 236; 2

Harper and James, Law of Torts, § 19.10). The requirement to elect has been blunted by a corollary rule which permits the plaintiff to rely on the doctrine despite evidence of specific cause of accident so long as the evidence does not fully account for the accident (*Bressler* v. *New York R. T. Corp., supra*; *Citrola* v. *Eastern Air Lines,* 264 F. 2d 815, applying New York law and discussing the relevant New York cases; *McKenna* v. *Allied Chem. & Dye Corp.,* 8 A D 2d 463, 466–467; cf. *De Roire* v. *Lehigh Val. R. R. Co.,* 205 App. Div. 549, 551, decided before the *Bressler* case, *supra*).

Of course, it is rare, if ever, that a plaintiff proves a defendant's misconduct by direct evidence which would satisfy the most absolute of tests, namely, immediate perception of the offending and operative conduct. One makes inferences from immediately observed conduct of machines and vehicles operated by human beings, even as with the automobile that is speeding, jumps to the sidewalk, or careens off the highway. In the case of the airplane the inferences are more difficult for most because the technology is not as familiar. The banking, turn, and flap retraction would certainly explain this accident, if the testimony were accepted. And a jury would of course be entitled to infer that the pilot had so manipulated the plane, in the same way that it could infer that a speeding automobile was intentionally driven at that speed or that it jumped to the sidewalk or careened off the highway because the driver made too sharp a turn.

In the light of the authorities it appears, therefore, and it is certainly arguable, that plaintiffs proceeded far enough in the proof of specific cause of accident for the New York rule of election to be invoked. But the error, if there was such, in allowing plaintiffs to continue to stand on *res ipsa loquitur*, was not productive of prejudicial error. So long as defendant did not, as evidently it could not, offer any different proof that would displace the circumstances which gave rise to the inference under the doctrine of *res ipsa loquitur* or would contradict the plaintiffs' proof of specific cause, the jury would have, as the trial court commented after the verdict it must have, found in favor of plaintiffs, either on a theory of *res ipsa loquitur* or on the proof of specific cause. Another liability trial would be a futility in this kind of airplane accident without survivors.

With respect to the damages trial, the court was correct in allowing business expert testimony as to the husband's future prospects in the fruit and produce business. These are not matters in the general knowledge of the jurors, or for that mat-

ter, the court (*Clark* v. *Iceland S. S. Co.*, 6 A D 2d 544, 547–548; Richardson, Evidence [9th ed.], § 387). So long as one is entitled to recover for loss of future potentialities, such evidence is permissible (*Faulk* v. *Aware, Inc.*, 35 Misc 2d 302, 306, mod. 19 A D 2d 464, 470–471, affd. 14 N Y 2d 899; *Grayson* v. *Irvmar Realty Corp.*, 7 A D 2d 436, 439, and authorities cited). On the other hand, it was error to allow proof as to the costs in providing a substitute for the wife. These are matters within the common ken, and subject to so many variables and choices that no objective standard can be supplied by an expert, if one there be (*Clark* v. *Iceland S. S. Co.*, *supra*; Richardson, *op. cit.*). However, this error too was not productive of the large verdict here. It is all too apparent from the verdict that the awful tragedy in this case with its poignant sympathy-inducing factors was one with which the jury could not cope in assessing the damages. The hugeness of the awards goes well beyond any influence possibly contributed by this "expert proof."

On the admission of evidence, the wills of the parents should have been admitted to help assess, to some degree, the pecuniary burden that would have been assumed by the parents with respect to the mongoloid child (see *Loetsch* v. *New York City Omnibus Corp.*, 291 N. Y. 308). It is obvious that a maximum, or even extravagent provision, for that child is no measure of the pecuniary loss, but rather what were the probabilities of provision by the parents for the child. The wills were evidence of those probabilities, at least for the early period of the father's then limited ability to make provision for her. Again, the error was not too serious, especially in the light of the determination this court will make for the reduction of the verdict or for the ordering of a new trial.

It is now appropriate to turn to a consideration of the size of the verdict. There is no doubt that the father's earning potentialities for the future are to be considered (*Faulk* v. *Aware, Inc.*, *supra*; *Grayson* v. *Irvmar Realty Corp.*, *supra*; *Briscoe* v. *United States*, 65 F. 2d 404, 406). Nevertheless, those potentialities must be discounted, not only financially in determining present value of future funds, but practically in recognizing that potentialities are contingent and subject to unforeseen and unforeseeable vicissitudes (*Grayson* v. *Irvmar Realty Corp.*, *supra*, p. 440). This, it is evident, the jury did not do. On the other side of the question, there is no doubt that the loss of both parents or the loss of a surviving parent is a much greater pecuniary loss than is measurable from loss of the parents considered separately. Plaintiffs are also correct

in arguing that some pecuniary loss, albeit much less, is sustained even after children attain majority and also with respect to expectations of inheritance. But as to such losses, with people as young as these who died here, at the start of their careers, the contingencies for the far future become extremely great and require an all but total discounting of the suggested expectations. (*Sternfels* v. *Metropolitan St. Ry. Co.*, 73 App. Div. 494, 502–504, affd. 174 N. Y. 512.)

The gross excessiveness of the principal awards is easily demonstrated. The gross award of $750,000 would yield at a 4% return, $30,000 per year for these four children, and still leave the capital unimpaired at their majority. This is far above the style of living to which they were accustomed while supported by a father earning under $15,000 per year, subject to taxes and his expenses of earning a living, or that they would attain for quite some years even under the most promising circumstances. Moreover, if one took the business expert's estimate of the father's future earnings at age 30 to 35 years at a level of $30,000 or $35,000 per year, those earnings, before discounting for present value and the practical contingencies, would be subject to income taxes and the expenses of earning that sum. One must also deduct the father's own expenditures for himself (even above the expenses of earning a living). Of course, on the other hand, the cost of raising these children will be greater than if they were raised by their own parents or parent. On even this crude analysis the jury award is out of all reason, explainable only because of sympathy and that the defendant was a large corporation. It is difficult to believe that a similar verdict would have been rendered against a smaller enterprise.

In this connection, of course, the costs of litigation, including lawyers' fees, may not be considered, just the same as the accretion of interest at the legal rate of 6% on the awards as allowed by law in death cases (Decedent Estate Law, § 132), now aggregating 24%, is not to be considered. Nor should one introduce amateurish speculation as to continuing inflation, in the same way that current interest rates, higher than 4%, should not be used without considering the unpredictable future fluctuation in such rates.*

---

* But see *Lucivero* v. *Long Is. R. R. Co.* (22 Misc 2d 674, 675) according recognition to "the constant erosion in the value of the dollar and the present and ever upward spiraling cost of living", relying, however, on *Neddo* v. *State of New York* (194 Misc. 379, affd. 275 App. Div. 492, affd. 300 N. Y. 533), holding that the court should be mindful of "the present day" devaluation of the dollar, a far different matter.

Withal, there cannot be much precision in assessing the pecuniary losses entailed in these unfortunate deaths. Humanity, sympathy, and a decent respect for the jury response to the exigencies of this case suggest a generous disposition and a rational compromise to bring the litigation to an end. Moreover, with children there is properly considered, in addition to financial support and direct financial benefits, the pecuniary value for the deprivation of parental guidance, advice and care (*Sternfels* v. *Metropolitan St. Ry. Co.*, 73 App. Div. 494, 498–502, *supra*; Anno.— Death Action — Damages — Sentimental Loss, 74 A. L. R. 11, 95–109).

On the foregoing basis an award for the father's death should not exceed $350,000 and for the mother's death $125,000. At a 4% return, and without determining present value of future funds (a highly improper exclusion) these sums would yield an annual return of $19,000, and leave the capital unimpaired at the majority of these children. Discounted for present value on an annuity basis until the youngest child reaches maturity the fund would yield an amortized annual return of $33,858, measured 21 years from the date of death. Of course, this would exhaust the fund and leave no allowance for pecuniary loss after majority or from frustrated expectations of inheritance. These outside factors are entitled to some evaluation. On the other hand, it is unreasonable to measure the gross annuity by the minority of the youngest child. If one takes the average minority of the four children — 17 years — the annual amortized return would be $39,044. Obviously, if this figure were to account only for direct pecuniary losses represented by direct financial support, it is an unreasonably large sum. Hence, the reduced gross figure of $475,000 allows some indeterminable large sum for pecuniary losses after majority of the children, for guidance, advice, care, and for the almost ephemeral, at this juncture, expectations of inheritance. It would constitute a very generous provision, if not an overly generous one, considering the uncertainties of the deceased father's future, if he had not died in this accident, and of the deceased mother if she too had not died in the accident.

As for the mongoloid child, there are offsetting factors. While it is true that she will require care beyond her majority, it is also true that there is unfortunately a ceiling on the expenditures that may be made providently on her behalf, as compared with her sisters. Moreover, there is, comparatively, a much diminished loss to her with respect to intangible parental guidance, advice and care, and expectations from inheritance.

Hence, for this purpose there would be a premature precision in trying to allocate the damages between her and her sisters (but see Decedent Estate Law, § 133), although it is obvious that the sum recovered must allow for her care beyond majority limited in turn by the shortened expectancy of life attributed to mongoloid persons. Taking the highest credible figures the record will support, $200 per month would cover the maintenance of this child. Were $200 per month allowed for her maintenance, at simple interest of 4%, a fund of $60,000 would yield sufficient to provide this maintenance. If her expectancy, dubiously computed at 37 years (as urged by plaintiffs) from the date of death of the parents, a substantially smaller sum would suffice, namely, $46,000. This would still leave a substantial fund of $429,000 to provide for the other three sisters, and therefore a larger share for each out of the gross annuities suggested above.

As a further indication of what might be a proper range for an award in a case of this kind, one may pursue the following calculations: Accepting that the father would have earned $35,000 within 5 or 6 years after 1962, less before 1967 or 1968 and perhaps more thereafter, one may also assume, very generously, that $15,000 of that income ($10,000 would be more realistic), after taxes, would be devoted to the maintenance of the four children. Taking an average minority of 17 years for the children such annual support if capitalized at a 4% rate of return amounts only to $182,485. Again, it should be observed that with respect to the mongoloid child the provision would probably be less than that for the other children. On the other hand, provision for her would have to be made beyond majority. Again, there is no allowance for post-majority benefits, compensable intangibles, or the expectations of inheritance. To this, of course, must be added a separate award for the mother's loss. If one allows another $100,000 for these added factors a gross jury award of $300,000 would not have been inadequate and, indeed, would have been ample.

On this analysis the suggested reduced awards, free of income taxes, are undoubtedly much greater than are indicated in a case where the law limits recovery to actual pecuniary losses without compensation for pain, suffering, emotional deprivation and the other intangibles which represent real but not monetarily compensable items (Decedent Estate Law, § 132; *Sternfels* v. *Metropolitan St. Ry. Co.*, 73 App. Div. 494, 500–501, *supra*; Anno.— Death Action — Damages — Sentimental Loss, 74 A. L. R. 11, *supra*). But because the court is impelled to

grant the children every consideration to which they are arguably entitled and to accord the greatest weight to the jury evaluation, where there is any doubt, it would make the provision it does (cf. *Meehan* v. *Central R. R. Co.*, 181 F. Supp. 594, in which a verdict of $315,000 was reduced to $235,000 for the death of a husband-father, and in which the various factors are discussed in meticulous detail).

Accordingly, the judgment in favor of plaintiffs should be reversed on the law, on the facts, and in the exercise of discretion, and a new trial ordered, with costs and disbursements to defendant-appellant, unless plaintiffs stipulate to reduce the award to $350,000 for the father's death, plus $5,000 for the funeral expenses, and to $125,000 for the mother's death, in which event the judgment should be thus modified, and as modified affirmed, with costs and disbursements to defendant-appellant.

McNally, Steuer and Capozzoli, JJ., concur.

Judgment in favor of plaintiffs unanimously reversed on the law, on the facts, and in the exercise of discretion, and a new trial ordered, with $50 costs and disbursements to defendant-appellant, unless plaintiffs stipulate to reduce the award to $350,000 for the father's death, plus $5,000 for the funeral expenses, and to $125,000 for the mother's death, in which event the judgment is thus modified and, as modified, affirmed, with $50 costs and disbursements to the defendant-appellant. Settle order on notice.