438 F.2d 293
 Letitia E. MYERS, as Administratrix of the Goods, Chattels
and Credits which were of Charles S. Myers,
deceased, Plaintiff-Appellee-Appellant,
v.
TOWN OF HARRISON, Defendant-Appellant-Appellee, and The CITY
OF WHITE PLAINS,M V A I C, Orienta Bus Line, Inc.,
Arthur Pelchat and William Smith,Defendants.
 Nos. 101, 102, Dockets 34569, 34595.
 United States Court of Appeals, Second Circuit.
 Argued Nov. 9, 1970.
Decided Feb. 16, 1971.
 
 Alfred S. Julien (Julien, Glaser, Blitz & Schlesinger, New York City, Morris Honig, New York City, of counsel), for plaintiff-appellee-appellant.
 Bernard Helfenstein, Brooklyn, N.Y. on the brief, for defendant-appellant-appellee.
 Before SMITH and FEINBERG, Circuit Judges, and LEVET,* District judge.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 This is an appeal from a judgment in favor of plaintiff after a trial before Judge Motley in the United States District Court for the Southern District of New York and a jury in an automobile negligence case which resulted in the death of the appellee's husband. The jury awarded damages in the amount of $481,250. The plaintiff has cross-appealed on the question of the proper rate of interest to be applied to the damage award. We find no error on the issue of liability. We find error in the charge on damages and reverse and remand for new trial on damages only.
 
 
 2
 At 1:35 a.m. on the morning of September 21, 1963, the appellee's intestate, Charles Myers, was proceeding in a northerly direction on North Street in White Plains, New York in a taxicab which he was operating. Myers came upon a police vehicle with its roof-light flashing operated by Patrolman Victor Fiore of the Harrison Police Department which was parked diabonally across part of North Steet, which at that point is a four-lane highway.[1] Myers brought his taxi to a stop near the police car and inquired as to what was occurring. Officer Fiore testified that he yelled at Myers to 'Get the hell out of here' and then started to get out of the patrol car. As he did so, Fiore saw a car driven by one William Smith come over the top of a hill some 600 to 800 feet away at a very high rate of speed (90 miles per hour). Officer Fiore jumped to the side of the road as Smith's vehicle collided with the prtrol car and the taxi. Smith was injured, and Myers was thrown out of his car and instantly killed.
 
 
 3
 The police pursuit which ended with the accident had begun in downtown Harrison when Officer Porto of the Harrison Police Department was told by an unidentified motorist that a black Pontiac had just backed into his parked car. Porto then pursued the Smith vehicle in order to ascertain thether it had been involved in the incident which had been reported to him. Porto turned on his lights and siren, but the Smith vehicle failed to stop. Porto pursued Smith through the Town of Harrison at speeds ranging up to 100 miles per hour, and he was soon joined by two other police vehicles in the chase. Their route took them through largely residential areas of the town over narrow, winding, and wet roads.
 
 
 4
 In the meantime, Fiore had been ordered to take up a position on North Street about one quarter of a mile from the place that the accident occurred. Instead of remaining there, however, Fiore on his own initiative moved farther up North Street to a position near the entrance to St. Agnes Hospital at the bottom of a rather steep hill where a driver heading north would not be able to see Fiore's patrol car until he reached the top of the hill some 600 to 800 feet away. There was expert testimony which is uncontradicted that a vehicle traveling at the rate of speed which Fiore Knew the Smith car to be going could not possibly have stopped in less than 1750 feet.
 
 The questions raised by the appellant are:
 
 5
 (1) Is there sufficient evidence to establish negligence on the part of the appellant as to the manner in which the pursuit was conducted?
 
 
 6
 (2) Is there sufficient evidence to establish negligence on the part of the appellant as to the way in which Fiore's vehicle was positioned on the highway?
 
 
 7
 (3) Were the negligent actions of appellant the proximate cause of the death of Myers?
 
 
 8
 (4) Was Myers guilty of contributory negligence?
 
 
 9
 (5) Was the amount of the damage award excessive?
 
 
 10
 Section 1104 of the New York Vehicle and Traffic Law, McKinney's Consol. Laws, c. 71, provides:
 
 
 11
 (b) The driver of an authorized emergency vehicle may: 3. Exceed the maximum speed limits so long as he does not endanger life or property.
 
 
 12
 (e) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others. L.1959, C. 775, Eff. Oct. 1, 1960
 
 
 13
 The appellee argues that the weather and road conditions over the course of the route of pursuit and the excessive speeds involved, combined with the fact that, so far as the Harrison Police knew, Smith had only been involved in a monor traffic incident, made the actions of the police unreasonable and showed a 'lack of regard for the safety of all persons.' (See, e.g. LoCicero v. Columbia Casualty Co., 268 F.2d 440 (5 Cir.), cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 187 (1959)).
 
 
 14
 The case of Stanton v. New York, 29 A.D.2d 612, 285 N.Y.S.2d 964, aff'd 26 N.Y.2d 990, 311 N.Y.S.2d 28, 259 N.E.2d 494 (1970) is relied upon heavily by appellant. There one Hayden, who was being pursued for a traffic violation by the state police, crossed the divider of an expressway and fled in a southbound direction in the northbound passing lane. The police officer also crossed into the northbound lane and chased Hayden at speeds up to 100 miles per hour. Hayden ended up colliding with a vehicle operated by plaintiff's intestate. The Court of Claims found no proof of negligence on the part of the state trooper in his conduct of the pursuit, and the Court of Appeals, affirmed on the majority opinion of the Appellate Division. That court noted:
 
 
 15
 The statutory requirement of section 1104 of the Vehicle and Traffic Law that the operator of an emergency vehicle should have 'due regard for the safety of all persons' and the imposition of responsibility for 'the consequences of his reckless disregard for the safety of others' are not such as to require compliance with the generally accepted definition of negligence. The immunity afforded the driver of an emergency vehicle from the regulations governing speed and direction of travel can only be denied when there is evidence of an exercise of these privileges in excess of reasonableness under the circumstances which the trial court did not find here.
 
 
 16
 While the Appellate Division thus made it clear that the normal standards of negligence do not apply to a law enforcement officer operating under section 1104, the court in Stanton was reviewing a non-jury trial in the Court of Claims where the trial judge had decided as a question of fact that the pursuing trooper was not negligent or reckless. Here, on the other hand, the trier of fact has found such negligence on the part of appellant, and the only question before this court is whether there was sufficient evidence on this question to allow it to be submitted to the jury. Speeds of up to 100 miles per hour on wet and narrow roads, through a residential section, in pursuti of a traffic violator might well be said to create an unreasonable risk to public safety and there was expert testimony that pursuit in these circumstances does not constitute 'common and accepted good police practices.' The after-acquired information that the pursued vehicle had been stolen does not excuse the negligence involved in the method of apprehending a person known only to have been involved in a minor traffic incident. (N. B. McCormick v. State, 34 Misc.2d 806, 229 N.Y.S.2d 441 (1962).)
 
 
 17
 Smith was also obviously guilty of negligent conduct, but this does not discharge the appellant's liability as a joing tortfeasor. The degree of culpability of each does not affect their respective responsibilities, for each is separately liable for the full extent of the damage caused. (Pearson v. City of New York, Sup., 142 N.Y.S.2d 14 (1955); Mazloum v. New York, N.H. & H.R.R., Sup., 115 N.Y.S.2d 238 (1952).)
 
 
 18
 The next question is did the positioning of the patrol car by Officer Fiore at the bottom of a steep incline on North Street and Fiore's failure to take any precautions to warn approaching motorists constitute sufficient evidence of negligence ligence to go to the jury. In Commisso v. Meeker, 8 N.Y.2d 109, 202 N.Y.S.2d 287, 168 N.E.2d 365 (1960), the defendant, sheriff, had parked his vehicle on the highway while giving a ticket to a speeding motorist. The plaintiff was involved in a head-on collision as he attempted to pass the obstructing vehicle. The New York Court of Appeals upheld a jury finding of negligence on the part of the sheriff noting:
 
 
 19
 Certainly the jury had a right to find on the basis of the foregoing evidence that the Deputy Sheriff did not act reasonably under the circumstances and that he negligently obstructed the highway. Taking the view of the evidence most favorable to plaintiff, as we must do in light of the verdict in her favor, it may be said that Zambon chose to obstruct the travelled part of the roadway on a night when traffic was exceptionally heavy, and failed to make full use of the 15-foot expanse of firm shoulder which was available to him. The jury also had a right to find on the facts when thus viewed that Zambon's negligence was a proximate cause of the accident and plaintiff's resulting injuries-- together, of course, with the negligent acts of Mastrangelo and Meeker (the drivers of the two cars which collided). 202 N.Y.S.2d at 289-290, 168 N.E.2d at 367. (See, e.g. Thain v. City, 35 A.D.2d 585, 313 N.Y.S.2d 484 (1970).)
 
 
 20
 In the present case, there was expert testimony that it was not proper or accepted police practice to position a patrol vehicle as was done here, and that in these circumstances the effect of the partial roadblock was to 'endanger anybody in that vicinity.' Fiore himself admitted that he took no other precautions. This would clearly appear to constitute sufficient evidence of negligence to allow the case to go to the jury.
 
 
 21
 Next, was there sufficient evidence to enable the jury to find that the actions of appellant were the proximate cause of the accident. There are here two lines of causation, both of which appear to have been sufficiently established. First, the excessive speed of the Smith vehicle could be said to have resulted from the fact that he was being pursued by the police, and it was rather clearly this high rate of speed which caused him to lose control of the car. Second, the position of the Fiore car, whether or not it completly blocked the entire roadway, could be said to have caused Smith to swerve or attempt to stop which in turn resulted in his losing control and thus the accident.
 
 
 22
 The appellant contends that Myers was guilty of contributory negligence in stopping his taxi next to the patrol car and in failing to move when warned by Fiore, and further, that the trial court's instructions on the issue of contributory negligence were inadequate. The jury apparently found that it was reasonable for Myers to stop his taxi when confronted with a police car with its light flashing, parked across the road, and that the warning by Officer Fiore was either not given or inadequate. There would seem to be no grounds which would justify a reversal on this point.
 
 
 23
 Judge Motley instructed the jury on the issue of contributory negligence as follows:
 
 
 24
 * * * Now on the issue of contributory negligence, the burden is, as I have told you, on the defendant. The defendant must show that the plaintiff's deceased husband was guilty of negligence proximately contributing to his own death.
 
 
 25
 If on the evidence as a whole, including any evidence introduced by plaintiff, you conclude that it is more probable that plaintiff's deceased husband was guilty of negligence proximately contributing to his own death, your verdict will be for the Town.
 
 
 26
 If, however, you cannot so conclude or you find that the evidence was so evenly balanced on that issue that you are unable to say that the greater weight of the evidence is on either side, your finding will be for the plaintiff (Appendix, p. 457).
 
 
 27
 This charge is fully adequate as to contributory negligence, and, in any event, the appellant voiced no exceptions to the charge at the time it was given to the jury.
 
 
 28
 The final point raised by appellant is that the amount of the damage award was excessive. For some years, it has been the law in this circuit that federal appellate courts have the power to reduce the amount of damages awarded by a jury. Dagnello v. Long Island Ry., 289 F.2d 797 (2d Cir. 1961); Moore-McCormack v. Richardson, 295 F.2d 583, 587 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962). It is also well settled, however, that where the trial judge has approved a verdict, the fact that the appellate court were it sitting as triers of fact might have allowed a different amount does not justify its interference. Whitaker v. Blidberg, Rothchild Co., 296 F.2d 554 (4 Cir. 1961); cf. Berner v. British Common-wealth Pacific Airlines, Ltd., 346 F.2d 532 (2d Cir.), cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1964). As the Supreme Court noted in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946):
 
 
 29
 Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.
 
 
 30
 At the time of the accident Myers was earning $6,550 per year at Union Carbide, plus approximately $3,600 from driving the taxi and $400 per year from the Naval Reserve, or approximately $10,500 per year. There is evidence that by the time of the trial, Myers would have been earning $11,500 at Union Carbide or a total income (assuming he kept his taxi job) of approximately $15,000. Myers' life expectancy was forty-one years, and he left three young children. Since at the time Myers was studying for further technical degrees in his field, it is reasonable to expect that he would move up with the company, although any estimate of his expected lifetime earnings is obviously highly speculative.
 
 
 31
 There is case law in New York which allows in award of this type that the jury include in its calculations the income producing capacity of the principal amount, the present value of future earnings, and to discount the total amount of the award because of the speculative and highly contingent nature of future earning capacity many years hence. (Zaninovich v. American Airlines, 26 A.D.2d 155, 271 N.Y.S.2d 866 (1966); Grayson v. Irvmar Realty Co., 7 A.D.2d 436, 184 N.Y.S.2d 33, 37 (1959).) In Zaninovich (supra) the decedent was approximately the same age as Myers, left four young children, and was also earning about $15,000 per year at the time of the award. The court estimated his probable maximum earning to be $30,000 to $35,000 per year which level he would reach at about age 35. The income produced from the investment of the award there was $30,000. The court found the amount of the award excessive noting:
 
 
 32
 The gross award of $750,000 would yield at a 4 percent return, $30,000 per year for these four children, and still leave the capital unimpaired at their majority. This is far above the style of living to which they were accustomed while supported by a father earning under $15,000 per year, subject to taxes and his expenses of earning a living, or that they would attain for quite some years even under the most promising circumstances.
 
 
 33
 271 N.Y.S.2d at 872.
 
 
 34
 There was relatively little testimony presented as to the question of damages. The only witnesses were a fellow employee of the decedent and the appellee herself. While it is true that the appellant made no request for a charge in reference to a possible discount or for the jury to consider in its computation a deduction for the decedent's expenses had he lived, it is also true that the trial court failed to call either of these facts to the attention of the jury. In its charge the court merely referred to 'loss of financial support which decedent made and would have continued to make during his lifetime.' The court set forth some elaboration as to 'other factors' by mentioning the 'loss of decedent's services to his wife and around the house'; 'loss of decedent's contribution for example, to the plaintiff for psychiatric care.' But whether this was intended to relate to the decedent's personal administrations or his payment for psychiatric treatment is unclear. There was little, if any, proof of personal psychiatric aid by the husband, and payments to psychiatrists would be provided for in the appellee's loss of her husband's income. In addition, in its charge as to loss of earnings the court mentioned life expectancy without distinguishing this from work expectancy.[2]
 
 
 35
 This court noted in McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34, 40 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960):
 
 
 36
 The purpose of damages is to compensate the plaintiff for losses which he has suffered to the time of trial and may reasonably be expected to suffer in the future. The plaintiff is entitled to have the jury instructed as to every item of loss, which includes reasonable medical expenses, loss of earnings past and future and pain and suffering past and future. On the other hand, the defendant, who must pay the damages, is entitled to have the jury instructed in such wise that it will make its calculations in the light of a proper understanding of what the plaintiff should receive in order to make him whole. The plaintiff should receive no more than that at the defendant's expense. The defendant is entitled to a charge which will direct the jury's attention to every item and consideration which may substantially reduce the plaintiff's loss so that the jury does not charge the defendant with a loss which the plaintiff would never have to suffer. Even handed justice requires nothing less than this.
 
 
 37
 (Lumbard, C.J., Dissenting)
 
 
 38
 The amount of the damages award here was obviously quite substantial. Yet, unfortunately, the record as indicated above, gives little clear indication of how the verdict was computed or what elements were considered and how much was allowed for each. No special interrogatories, however desirable in such a case, were propounded.
 
 
 39
 Consequently, while we intimate no views as to whether in fact the amount of the award was excessive, we are of the opinion that the record in its present state fails to provide a sufficient basis as to the method of its computation to allow us to make such a determination. Therefore, while upholding the court below as to the finding of liability, we reverse its conclusions as to the amount of damages and remand for a new trial on this issue.[3]
 
 
 40
 Finally we come to the question on the cross-appeal as to the maximum allowable interest under the New York General Municipal Law, McKinney's Consol. Laws, c. 24, Section 3-a. At the time of the accident the maximum allowable interest rate was set at 4%. In 1969 this was raised to 6% (effective February 25, (1969). The question is whether the 6% Rate will be applied retroactively from the date of the accident until February, 1969. Judge Motley held, 310 F.Supp. 526, that appellee would be allowed only 4% Interest up until the date of the statutory change relying on the authority of People ex rel. Emigrant Industrial Bank v. Sexton, 284 N.Y. 57, 29 N.E.2d 469 (1940), a certiorari proceeding to reduce a tax assessment on real property and for refund of excess taxes with interest. There the New York Court of Appeals held that the rate prevailing on the date of the payment of the tax was applicable. There is, however, earlier authority from the Court of Appeals that the statutory interest in effect at the time of the entry of the judgment will be applied retroactively to the time of the accident in wrongful death actions. In Salter v. Utica & Black River Railroad Company, 86 N.Y. 401 (1873), the court held:
 
 
 41
 We think that under this statute the rate of interest is governed by the statute regulating interest, in force when the damages are ascertained by verdict. The right to interest then accrues, and relates back to the time of the death. But the rate of interest on the damages, liability for which is then first established, and the amount of which is until that time uncertain and unliquidated, is the rate which the statute then prescribes.
 
 
 42
 86 N.Y. at 402.
 
 
 43
 The court in Emigrant (supra) specifically distinguished Salter with no suggestion that its holding is no longer applicable:
 
 
 44
 In the Salter case the court had before it the question of the rate of interest to be allowed on damages for wrongful death when the legal rate had been changed from seven per cent to six per cent between the time of the death and the entry of judgment. The court held that the six per cent rate applied for the whole period. While this holding indicates that under some circumstances interest statutes may be applied retroactively, we find no warrant for such a result in this case.
 
 
 45
 (See e.g., Toomey v. New York City Transit Authority, 10 A.D.2d 728, 199 N.Y.S.2d 281, aff'd 8 N.Y.2d 970, 204 N.Y.S.2d 348, 169 N.E.2d 10 (1960).)
 
 
 46
 Admittedly the state of the law in New York on this point is somewhat unclear. Hopefully the state courts will have occasion to re-examine the question prior to the entry of final judgment in the present case. As of the moment, however, we are of the view that the rationale set forth in Salter is controlling.
 
 
 47
 Affirmed as to liability. Reversed and remanded for new trial on the issue of damages only. Retrial on damages should be scheduled as promptly as feasible.
 
 
 
 *
 Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The exact position of the police car prior to the accident is in dispute. The defendant-appellant contends that it was blocking only the two southbound lanes, while the appellee alleges that at least part of the vehicle was over the center line and extending into the two northbound lanes
 
 
 [2]
 The complete charge on damages follows:
 'Incidentally, the fact that I instruct you on the issue of damages does not mean that you are to assume that the Court is of the view that the plaintiff is entitled to a verdict or indeed as to how you should decide the case. That is, as I have already told you exclusively your function. The purpose of the law is to award, as far as possible, just and fair compensation for the loss which directly flowed from the wrong done to the plaintiff. The damages awarded must be purely compensatory and reasonable, neither inadequate nor excessive. The matter rests in your sound discretion. You will be guided again by your common sense and experience. Your award must bear a reasonable relationship to the damages suffered.
 In assessing damages your aim should not be to make the plaintiff a rich woman at the expense of the defendant Town of Harrison. Personal feelings or sympathy or bias should not enter into your consideration. Your aim should be to award plaintiff a sum of money which would be fair and reasonable compensation to her for injuries she has received as the result of the death of her husband.
 The plaintiff is entitled to damages only for those injuries and losses which are attributable to or which was proximately caused by defendant's negligence.
 Plaintiff, if she has sustained her burden of proof is entitled to compensation as follows:
 Hospital and funeral expenses, loss of financial support which decedent made and would have continued to make during his lifetime; loss of decedent's services to his wife and around the house; loss of decedent's contribution, for example, to the plaintiff for psychiatric care. At the time of the accident the plaintiff claims that her husband was earning approximately $10,000 a year. According to the life expectancy tables of a government agency, decedent had a life expectancy of 41 years. In awarding damages in this case, you may take this fact into consideration.
 Plaintiff is also entitled to recover for loss of care, advice, nurture, religious guidance and companionship which her deceased husband gave to her, and to each of her three children.' Appendix, pp. 470-472.
 
 
 [3]
 We would suggest to the court below that on remand the jury be given specific instructions as to the deduction of the expenses of the decedent from the total award (Meehan v. Central Railroad Co., 181 F.Supp. 594, 619 (S.D.N.Y.1960)