DENNIS S. DELONG, Individually and as Administrator of the Estate of AMALIA DELONG, Deceased, Respondent, v COUNTY OF ERIE et al., Appellants.

Fourth Department, November 9, 1982

**APPEARANCES OF COUNSEL**

*Palmer, Heffernan, Wickser & Beyer* (*John J. Heffernan* and *Peter M. Kooshoian* of counsel), for County of Erie, appellant.

*Joseph P. McNamara, Corporation Counsel* (*Carl Trono-lone* of counsel), for City of Buffalo, appellant.

*Garvey, Magner & Love, P. C.* (*Philip H. Magner, Jr.,* of counsel), for respondent.

OPINION OF THE COURT

HANCOCK, JR., J.

A municipality cannot be cast in damages for mere failure to provide adequate police protection (*Riss v City of New York,* 22 NY2d 579). But "where a municipality assumes a duty to a particular person or class of persons, it must perform that duty in a nonnegligent manner * * * As Chief Judge CARDOZO succinctly stated: 'The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all.' (*Moch Co. v Rensselaer Water Co.,* 247 NY [160], at p 167)" (*Florence v Goldberg,* 44 NY2d 189, 196; see *Schuster v City of New York,* 5 NY2d 75, concurring opn McNALLY, J., at pp 87, 88; *Zibbon v Town of Cheektowaga,* 51 AD2d 448, app dsmd 39 NY2d 1056). Applying these accepted rules to the record before us, we affirm the jury finding of coequal liability on the part of the County of Erie and the City of Buffalo. Together, they assumed a special duty to provide emergency police assistance to Amalia DeLong, and, acting in concert in carrying out the undertaking, they were negligent. As a result of their negligence, Amalia DeLong was stabbed to death in her home by an intruder.

In its verdict the jury awarded to her administrator $200,000 for her conscious pain and suffering and $600,000 for wrongful death, finding each defendant 50% responsible. We are all of the opinion that the verdict for conscious pain and suffering should be affirmed. As for the verdict for wrongful death, a majority of the court conclude that it also should be affirmed, but two of our number would reverse and grant a new trial on damages only for that cause of action. On appeal defendants raise several questions both as to liability and damages. To discuss their contentions as to liability, a recital of the events leading to Amalia DeLong's death is necessary.

Before her death, Amalia DeLong, her husband, and their three young children resided at 319 Victoria Boulevard in the Village of Kenmore, a suburb of Buffalo located in Erie County. In October, 1976, the Village of Kenmore was one of the four communities outside of Buffalo fully served by the 911 emergency telephone system operated by the Central Police Services, an agency of Erie County, with the active assistance and co-operation of the Buffalo Police Department. The system was located in the 911 room in Buffalo police headquarters in downtown Buffalo. At 9:29:29 in the morning of October 25, 1976 Amalia DeLong dialed 911 on her telephone and was immediately connected to the 911 room. The transcript of her call is as follows:

| 9:29:29 | - | Caller: | "Police?" |
|---|---|---|---|
| | | Complaint Writer: | "911." |
| | | Caller: | "Police, please come, 319 Victoria right away." |
| | | Complaint Writer: | "What's wrong?" |
| | | Caller: | "There's a burglar." |
| 9:29:34 | - | Complaint Writer: | "In there now?" |
| | | Caller: | "I heard a burglar; I saw his face in the back; he was trying to break in the house; please come right away." |
| | | Complaint Writer: | "Okay, right away." |
| 9:29:43 | - | Caller: | "Okay." |

The call had lasted 14 seconds. The complaint writer had recorded the address on the complaint card as "219 Victoria". He had not ascertained the caller's name, that she was calling from the Village of Kenmore, or that the complete name of the street was "Victoria *Boulevard*" (emphasis supplied). Aware that there was a Victoria *Avenue* in the City of Buffalo and assuming that he was dealing with a Buffalo emergency, the complaint writer stamped the word "flash" on the complaint card and routed it on the high priority conveyor to the Buffalo police dispatcher stationed on the other side of a glass partition. At 9:30:48, the dispatcher broadcast to the cars on duty

in the 16th Precinct (where Victoria Avenue was located) the following: "Car 16 at 219 Victoria. A burglary in progress." At 9:33:46 one of the cars radioed back: "Address of 219 Victoria does not exist — highest number 195." The dispatcher responded: "Okay. You're clear on that. No such address as 219 Victoria or burglary in progress." Thus, at 9:34, the 16th Precinct cars were released from the call and no further action was taken. Less than four and one-half minutes had elapsed from the end of Amalia DeLong's call. If the call had been identified as 319 Victoria Boulevard in the Village of Kenmore, the complaint writer could, by pressing two buttons, have made instant and direct contact with the Village of Kenmore Police Department.

At approximately 9:42, neighbors observed Amalia De-Long run from the front door of her house. She was naked, covered with blood and bleeding profusely. She fell to the sidewalk. Before her collapse, she uttered her only words: "The baby. The baby." Her infant child could be seen standing inside the open door.

The Village of Kenmore Police Department responded immediately to a call for assistance with a car which arrived within one minute — at 9:43. The Kenmore Police Chief testified that the police station was approximately 1,375 feet from the DeLong house and that if the police car had been responding to the report of a burglary of an occupied house, it would have used the siren in approaching to scare the burglar away. The paramedics arrived at 9:47. Their records indicated that at 9:53 Amalia DeLong had no vital signs.

Amalia DeLong had received seven knife wounds: to the left side of the neck, the left side of the head, the second finger of the right hand, the nail of the third finger on the left hand, the thumb of the left hand, and a wound to the left shoulder. The laceration on the neck was fatal. It was deep and had severed the jugular vein and carotid artery on the left. The cuts on the fingers were described as being of a "defensive type".

The police in searching the house found evidence of a savage attack. A housecoat, feminine undergarments, and a brassiere with a broken clasp were found on the living

room floor, and pillows, papers and other items were strewn about. There were spatterings of blood on the walls and floor in the kitchen, in the hallway and on the rug in the living room and several large stains on the front door, on the rug inside the door and on the porch.

The time of Amalia DeLong's death could not be precisely fixed, but it occurred between 9:42, the time when she spoke her last words, and 9:53, when she showed no signs of life. A pathologist testified that a person of her size could have lived from two minutes and 25 seconds to four minutes and 49 seconds after severance of the jugular vein and carotid artery. He opined that the fatal blow was inflicted at 9:38, four minutes after the dispatcher had "cleared" the call.

The purpose of the 911 emergency or "hot line" system is to assist in the delivery of police services to the people in the communities served (determined by whether the telephone exchanges in the communities are such that dialing 911 will give an automatic connection with the 911 room at Buffalo police headquarters). The public was made aware of the 911 emergency system by, among other things, a listing on the page in the telephone book for the Erie County metropolitan area headed "Emergency Numbers". The first caption appearing on the page in large type is "Police", opposite which appears in slightly smaller type a subheading "Local Police". For both police and local police the number given is "911".

The system has two components: complaint writing and dispatching. The Buffalo Police Department performed both functions until March, 1975 when the city and county entered into a contract transferring the 911 complaint writing function to the county, to be performed by county civil service employees. Under the contract, the city agreed to furnish the facilities for the 911 operation at the Buffalo police headquarters including switchboard services, parking places, locker space and other necessaries for the county employees. The contract also provided that: "For one year from the date of this agreement, the City shall keep assigned to the complaint writing function sufficient police officers per shift experienced in complaint writing, at the City's expense, to provide training, supervision and

guidance to County personnel engaged in the complaint writing function." And that "[a]fter one year, it shall be mutually agreed by the Commissioner of Central Police Services and the Commissioner of the Buffalo Police Department whether this arrangement for training and supervision shall be continued, for what period it shall be continued, or whether particular situations may at various periods require such an arrangement." And that "[t]he City of Buffalo, specifically the Buffalo Police Department '911' Emergency Control Center, expects to maintain its own dispatching personnel and supervisory Lieutenants"; and further that no substantial changes in procedures which might require changes in the complaint writing function shall be "instituted without the concurrence of the Commissioner of Central Police Services and the Commissioner of the Buffalo Police Department."

Pursuant to the contract, the Buffalo Police Department continued to train the complaint writers and were still doing so on October 25, 1976. Moreover, a lieutenant of the Buffalo Police Department or an acting lieutenant was always present in the 911 room. Although not directly in the chain of command, his function was to supervise, train and give assistance to the complaint writers and to coordinate the activities of the complaint writers and the Buffalo police dispatchers. He was considered to be a figure of authority.

The County Commissioner of the Department of Central Police Services described the system as "a joint venture in the operations of the 911 center between the City of Buffalo and the County of Erie" with the city police performing the dispatching function and the county employees performing the complaint writing function. The Buffalo police lieutenant is there, he testified, "to supervise any * * * type of incident that the complaint writer or, I assume, the other party may have questions about."

Many pages of testimony concern the instructions for taking and recording complaints as given in the training sessions and set forth in the "Manual for 911 Services". Complaint writers were directed to obtain exact information as to the location of the call and always to repeat the address of the call for verification. The "Manual for 911

Services" contained, among others, the following instructions for taking complaints: "It is very important that the information recorded on the card be accurate and adequate to eliminate needless call backs from the dispatcher to the complaint desk and 'standby' to units. To facilitate receiving the exact location of calls, you must determine and so indicate on the card, if address is an apartment, rear house, apartment number, etc. (Always repeat the address to the caller for verification.) If necessary, ask the caller for the spelling of the street name or the name of the nearest cross street." And: "Sufficient time must be taken on each call to avoid confusion or incorrect addresses due to duplicate or similar sounding street names".

The four basic questions to be asked are detailed in the manual: "1. What is the problem? — obtain this information first to determine Agency jurisdiction. 2. Where? 3. Who is involved? 4. When did it happen?" Among the telephone techniques and procedures for the complaint writers prescribed in the manual is the direction to "use caller's name."

On the morning of October 25, the complaint writer, in addition to mistakenly recording the address on the complaint card as 219 instead of 319 Victoria, failed to follow the instructions in four respects: (1) he did not ask the name of the caller; (2) he did not determine the exact location of the call; (3) he did not address the caller by name; (4) he did not repeat the address.

The operating procedures in effect on October 25, 1976 also called for follow-up action if, as with the DeLong call, the report came back to the dispatcher: "No such address." In such event, the dispatcher was required to notify the complaint writer or the 911 lieutenant (the Buffalo police lieutenant on duty in the 911 room) so that the tape recording of the call could be replayed, the Haines Directory and the street guides consulted, and other communities having street names identical or similar to the street name given by the caller immediately notified. On Amalia DeLong's call, no follow-up of any kind took place. The call was treated as a fake.

I

Our discussion of the questions raised concerning liability must start with *Riss v City of New York* (22 NY2d 579, *supra*) in which the court found no legal responsibility for the tragic consequences of the city's failure to furnish police protection despite proof of Linda Riss' repeated and agonized pleas for assistance. In an opinion by then Associate Judge BREITEL, the court, with one dissent, concluded: "there is no warrant in judicial tradition or in the proper allocation of the powers of government for the courts, in the absence of legislation, to carve out an area of tort liability for police protection to members of the public. Quite distinguishable, of course, is the situation where the police authorities undertake responsibilities to particular members of the public and expose them, without adequate protection, to the risks which then materialize into actual losses (*Schuster* v. *City of New York,* 5 N Y 2d 75)" (*Riss v City of New York, supra,* p 583). This fundamental rule remains the law (see *Weiner v Metropolitan Transp. Auth.,* 55 NY2d 175; *Bass v City of New York,* 32 NY2d 894, affg 38 AD2d 407). As noted in *Riss* and in *Dutton v City of Olean* (60 AD2d 335), when a relationship is created between the police and an individual which gives rise to a special duty, the municipality loses its governmental immunity and liability may result. Courts have found such a special duty to be owing "to informers (*Schuster v City of New York,* 5 NY2d 75), undercover agents (*Swanner v United States,* 309 F Supp 1183), persons under court orders of protection (*Baker v City of New York,* 25 AD2d 770), and school children for whom the municipality has assumed the responsibility of providing crossing guards (*Florence v Goldberg,* 48 AD2d 917)" (*Dutton v City of New York, supra,* p 338).

Whether Amalia DeLong was a person to whom the municipalities owed a special duty so as to be accountable for negligence in the performance of that duty is the question. Defendants argue that the county and city, in maintaining the 911 emergency call system for the public generally, assumed no special obligation to protect Amalia DeLong, and that, therefore, the case is governed by the holding of no liability in *Riss*. They distinguish *Schuster v*

*City of New York* (*supra*) where the special relationship giving rise to liability was found in the obligation owed by the municipality to an informer who, at the risk of his life, had given information to the police.

█ The defendants' argument misses the mark. It is not the establishment of the emergency call system to serve the Village of Kenmore, standing alone, which creates the duty. It is the holding out of the 911 number as one to be called by someone in need of assistance, Amalia DeLong's placing of the call in reliance on that holding out, and her further reliance on the response to her plea for immediate help: "Okay, right away." This is not a mere failure to furnish police protection owed to the public generally but a case where the municipality has assumed a duty to a particular person which it must perform "in a nonnegligent manner, [although without the] voluntary assumption of that duty, none would have otherwise existed" (*Florence v Goldberg*, 44 NY2d 189, 196, *supra*). The complaint writer's acceptance of the call, his transmittal of the complaint card to the dispatcher and the dispatcher's radio calls to the police cars were affirmative actions setting the emergency machinery in motion. This voluntary assumption of a duty to act carried with it the obligation to act with reasonable care (see *Schuster v City of New York, supra,* concurring opn McNALLY, J., p 87).

But, defendants remind us, failing to fulfill an undertaking to provide police protection does not result in municipal liability unless it be shown that the police conduct in some way increased the risk (see *Zibbon v Town of Cheektowaga*, 51 AD2d 448, *supra,* and cited authorities). They maintain that the evidence does not establish that the conduct had "gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury" (*Moch Co. v Rensselaer Water Co., supra,* p 167). In other words, defendants argue, although the hand may have been set to the task and withdrawn (see *Moch Co. v Rensselaer Water Co., supra,* p 167), it has resulted in no harm. We disagree.

While there could in this case be no direct evidence that Amalia DeLong relied to her ultimate detriment on the assurance of police assistance, the circumstantial evidence

strongly suggests that she did so. Instead of summoning help from the village police or from her neighbors (one of whom was a captain in the Kenmore Police Department), she waited for the response to her 911 call. Instead of taking her baby and going out the front door where she would have been safe, she remained defenseless in the house.

Nor can we agree that the proof was insufficient to establish proximate cause. Where different inferences may reasonably be drawn from the evidence, the question is one for the jury (see *Sewar v Gagliardi Bros. Serv.,* 69 AD2d 281, 289, affd 51 NY2d 752; *Pagan v Goldberger,* 51 AD2d 508). Here, the jury could have concluded that, without the critical mistakes in handling the initial transmission and the subsequent failure to conduct a follow-up, a Village of Kenmore police car would have arrived in time to prevent the attack or to stop the intruder before he could inflict the final fatal wound to the neck.

Finally, contrary to the city's contentions, we view the evidence as supporting the jury's conclusion that the city and county were equally at fault. We find no merit in defendants' other arguments on the liability issue.

II

█ Although, as defendants have emphasized, the period during which Amalia DeLong could have suffered from her wounds was brief (from approximately 9:30, when she completed her call, to shortly after 9:42, when she collapsed on the sidewalk), we cannot find the verdict of $200,000 for conscious pain and suffering "so disproportionate to the injur[ies] as to not be within reasonable bounds" (*Juiditta v Bethlehem Steel Corp.,* 75 AD2d 126, 138). The jury could properly have considered in its award the terror Amalia DeLong must have experienced during her ultimate struggle to save herself and her child from a murderous assailant (see *Juiditta v Bethlehem Steel Corp., supra,* p 138). The court properly and without exception charged the jury that it should consider Amalia DeLong's fear and apprehension in their assessment of the damages.

Accordingly, the judgment insofar as it awards damages for conscious pain and suffering, should be affirmed.

DENMAN, J.

█ The jury's award of $600,000 on the wrongful death cause of action is not excessive and was not the result of an error at trial. The standard by which damages in a wrongful death action are measured is established by EPTL 5-4.3 which provides that the amount of recovery is "to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." Despite the fact that the standard for recovery is couched in terms of pecuniary loss, recovery is not limited to compensation for loss of money or property. It has long been recognized that pecuniary advantage results as well from parental nurture and care, from physical, moral and intellectual training, and that the loss of those benefits may be considered within the calculation of "pecuniary injury" (*Tilley v Hudson Riv. R. R. Co.*, 24 NY 471; see, also, *Juiditta v Bethlehem Steel Corp.*, 75 AD2d 126, 139). In determining what is just compensation for the pecuniary injury sustained by a decedent's beneficiaries, the courts have considered myriad factors, including the decedent's age, relationship to the person seeking recovery, earning capacity and life expectancy. As we recently noted, "[s]ince there is little probability that the facts in any two wrongful death cases will be alike, and, in arriving at a proper award, an infinite variety of human characteristics and family situations affect the numerous factors which must be examined, each case must be viewed on its own merits with respect to the damages recoverable" (*Franchell v Sims*, 73 AD2d 1, 6).

Amalia DeLong was 28 years old at the time of her death; her husband was also 28. Her three children were 8, 6 and 1 years of age. Decedent was a housewife and was not employed outside the home, but testimony at trial indicated that she participated actively in raising her children. In addition to doing the cooking, cleaning, housekeeping and bookkeeping for the family, she also made most of the children's clothes. Over the objection of defendants, plaintiff was permitted to introduce the expert testimony of a professor of economics who calculated that the replacement cost of the services performed by a housewife to a family statistically similar to that of the decedent was $527,659.

In determining that the admission of this testimony was error and may have contributed to the size of the verdict, the dissenters rely on the rule of *Zaninovich v American Airlines* (26 AD2d 155), in which the court held that expert testimony was inadmissible to establish the cost of providing substitute services for those of a decedent housewife. The court reasoned that "[t]hese are matters within the common ken, and subject to so many variables and choices that no objective standards can be supplied by an expert, if one there be" (*Zaninovich v American Airlines, supra,* p 159). The rule of *Zaninovich* was based on the general evidentiary proposition that expert opinion is not admissible regarding matters within the general knowledge and expertise of the jury (see Richardson, Evidence [10th ed], § 367). Implicit in the *Zaninovich* rule is the assumption that reliable expert testimony is not available and that the subject matter does not lend itself to scientific measurement. That view seems incongruous in today's technological society and overlooks a wide range of experts and significant data in the various social sciences and in economics. If at one time evaluation of such services resisted precise measurement, that is certainly no longer true and the belief that a jury somehow knows how to make such computations is unrealistic. Even assuming that a jury is familiar with the multiplicity of services which the modern housewife performs for her family, the economic value of such services cannot be said to be a matter within the common ken. Indeed, the fact that many may take the value of such services for granted is itself a compelling reason for affording a jury a rational standard by which to evaluate those services lest they be undervalued and survivors inadequately compensated.

Here a qualified economist testified on the basis of statistical data. He estimated the time spent by an average housewife in the circumstances of decedent on various household tasks, including food preparation, house maintenance, clothing maintenance, family care, and other miscellaneous services, and then estimated the cost of purchasing such services in the employment market. That testimony was relevant to the issues of damages, was within the expertise of the witness whose qualifications

were not disputed and was based on extensive economic and sociological data beyond the experience of the average juror.

The Federal courts and courts in a majority of our sister States have long permitted expert testimony in these circumstances (see Admissibility and Sufficiency of Proof of Value of Housewife's Services, in Wrongful Death Action, Ann., 77 ALR3d 1175), recognizing that although a layman may have a general idea of the type of services performed by a housewife, expert opinion is necessary in order to place a realistic value on those services (see Ann., 77 ALR3d 1175, 1184-1193). Indeed, the courts of this State have not consistently excluded such proof. As early as 1895 in an action to recover the value of housekeeping services, the Court of Appeals noted the difficulty confronting a plaintiff in attempting to establish a value for the variety of duties embraced in the term "housekeeper" and approved the admission of testimony from a person engaged in the business of hiring housekeepers (*Edgecomb v Buckhout*, 146 NY 332).

As the District Court for the Southern District of New York noted over two decades ago when it rejected the argument that such evaluation was not within the realm of permissible expert testimony,

"Popular knowledge and common sense may be and indeed are valuable. But they are not the sole recourse. The fact that parents from time immemorial have taken care of their children does not establish that the views of a professional home economist may not be sounder than those of untrained laymen in determining the cost of those elements that go into the home in order to provide the children with so-called 'substitute mother' care.

"As knowledge becomes more professionalized, specialists will more frequently be called upon as expert witnesses. This is a judicial by-product of an age of pervasive technology and expanding social sciences." (*Merrill v United Air Lines*, 177 F Supp 704, 705.)

Recognizing that we espoused the rule of *Zaninovich* (*supra*) in *Ashdown v Kluckhohn* (62 AD2d 1137), we now reject that view, concluding that it prevents relevant proof

of the economic value of a decedent housewife's services, thus incurring the risk of inadequately compensating a decedent's family for the very real costs expended in replacing her services.

Accordingly, the judgment should be affirmed in its entirety.

HANCOCK, JR., J. (dissenting as to verdict for wrongful death). With respect to the verdict of $600,000 for "the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought" (EPTL 5-4.3), we must differ with our colleagues. In light of other awards for the death of a housewife and mother, we find it excessive (see *Matter of McBride v Bentivegna,* 90 AD2d 981; cf. *Juiditta v Bethlehem Steel Corp.,* 75 AD2d 126, upholding an award of $100,000 exclusive of lost wages where decedent had four children; *Simmons v Kinney Nat. Serv.,* 53 AD2d 846, affd 43 NY2d 659, reducing an award of $325,000 for the death of a 30-year-old housewife and mother of three children, 10, 9 and 5 years of age, to an award of $250,000; *Rodriguez v Columbus Hosp.,* 38 AD2d 517, finding excessive an award of $100,000 for the death of a 49-year-old housewife who left a husband and three children, ages 12, 10 and 8; *Griscti v State of New York,* 35 AD2d 764, reducing an award of $100,000 to $65,000 for damages for wrongful death of a housewife who was 38 at the time of her death and left a husband and four infant children, all under the age of 8 years; *Zaninovich v American Airlines,* 26 AD2d 155, reducing an award from $200,000 to $125,000 where the mother was not employed and had four children, one of whom was mongoloid; see, also, *Sewar v Gagliardi Bros. Serv.,* 69 AD2d 281, affd 51 NY2d 752).

We note that an error at trial may have contributed to the size of the verdict (cf. *Zaninovich v American Airlines, supra,* p 159). The court over objection permitted expert testimony by a professor of economics to the effect that the replacement cost of a housewife's services to a family statistically similar to the deceased's was $527,659. Under the rule established in *Zaninovich,* it is error to allow expert proof as to the cost of providing a substitute for a housewife's services because "[t]hese are matters within

the common ken, and subject to so many variables and choices that no objective standard can be supplied by an expert" (*Zaninovich v American Airlines, supra,* p 159). We have recently applied this rule in *Ashdown v Kluckhohn* (62 AD2d 1137).

For these reasons, we believe that the award of $600,000 for the wrongful death of Amalia DeLong should be reversed and a new trial granted as to damages only on that cause of action.

DILLON, P. J., DENMAN, MOULE and SCHNEPP, JJ., concur with HANCOCK, JR., J., as to affirmance of verdict for conscious pain and suffering. DILLON, P. J. and SCHNEPP, J., concur in affirmance of verdict for wrongful death in an opinion by DENMAN, J., from which HANCOCK, JR., and MOULE, JJ., dissent in a separate opinion by HANCOCK, JR., J.

Judgment affirmed, with costs.