# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 28, 2012 Session

## LORI GREGORY, IN HER CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMES BALLENTINE
### v.
## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

An Appeal from the Circuit Court for Davidson County
No. 11C805     Barbara N. Haynes, Judge

No. M2011-02061-COA-R3-CV - Filed October 26, 2012

This is a negligence claim under Tennessee's Governmental Tort Liability Act. The decedent was involved in a serious vehicular accident. A witness called the defendant municipality's 911 emergency communications center for help. The 911 responders went to the accident scene and transported the decedent to a local hospital, where he died. The decedent's mother filed this lawsuit against the municipality, alleging that the 911 operator was negligent in failing to summon emergency personnel from a neighboring county, because those responders were closer to the scene of the accident and could have provided aid to the decedent sooner. The municipality filed a motion for judgment on the pleadings, arguing *inter alia* that it owed no duty to summon aid outside of its jurisdiction. The trial court granted the motion, and the plaintiff now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

John E. Herbison, Clarksville, Tennessee, for the Plaintiff/Appellant Lori Gregory, in her capacity as personal representative of the Estate of James Ballentine

Saul A. Solomon, Director of Law, and Andrew D. McClanahan, James E. Robinson, and R. Alex Dickerson, Assistant Metropolitan Attorneys, for the Defendant/Appellee Metropolitan Government of Nashville and Davidson County

# OPINION

## FACTUAL BACKGROUND [1]

On May 30, 2010, 18-year-old James Ballentine ("decedent") was involved in a terrible collision in which his vehicle rolled over. The crash occurred at 5:09 p.m. on Springfield Highway in Goodlettsville, Tennessee, located in the General Services District of Davidson County and within sight of the boundary line between Davidson County and Robertson County. At 5:10 p.m. and 5:11 p.m., unidentified bystanders placed emergency 911 calls to the Emergency Communications Center of Defendant/Appellee Metropolitan Government of Nashville and Davidson County ("Metro Government").[2] The 5:11 p.m. caller described the scene to the 911 dispatcher: "rollover, smoke coming from vehicle, one vehicle on its side/ believes four people pinned inside, people are trying to get the people out of the vehicles, worried the vehicles are going to catch on fire." The decedent was one of the persons pinned in this vehicle. The 911 operator dispatched emergency vehicles and personnel from Goodlettsville, which is in Davidson County. When emergency personnel arrived on the scene, they extricated the decedent from his vehicle. He was then transported to Vanderbilt University Hospital, where he died some 12 hours after the crash.[3]

On February 28, 2011, the decedent's mother, Plaintiff/Appellant Lori Gregory ("Ms. Gregory"), filed this lawsuit against Metro Government in the Circuit Court of Davidson County, Tennessee. She filed as the decedent's representative, alleging claims pursuant to Tennessee's Governmental Tort Liability Act ("GTLA"), Tennessee Code Annotated § 29-20-201, *et seq*. She alleged in the complaint that the nearest available first responders were not located in Davidson County, but rather were located in the cities of Ridgetop and Greenbrier, which are located in Robertson County.[4] The refusal by Metro Government to

---

[1]The factual summary is taken from the allegations in the complaint, because this lawsuit was dismissed on the face of the complaint.

[2]Metro Government is a consolidated city and county governmental unit organized pursuant to Tennessee Code Annotated § 7-1-101 *et seq*. Metro Government provides ambulance and emergency vehicle services under the auspices of the Metropolitan Fire Department.

[3]The complaint does not indicate how long it took for the Goodlettsville emergency personnel to arrive on the scene, only that it took "several minutes" after they arrived for an ambulance to transport him to a hospital. The complaint contains no allegation that the Goodlettsville emergency personnel acted in a negligent manner.

[4]Actually, although the great majority of the City of Ridgetop is located in Robertson County, a small portion of it lies in Davidson County. Neither party cited this fact, and Ms. Gregory did not argue that the first

(continued...)

summon help from these closer cities, she asserted, caused unnecessary delay that reduced the decedent's chances of survival or at least increased his pain and suffering. Ms. Gregory claimed that the harm to her son caused by the delay was highly foreseeable, and she cited similar previous incidents near the county line – some involving fatalities. The complaint stated:

(6) The nearest municipality which could have provided emergency assistance to the endangered occupants of these vehicles was the City of Ridgetop, which had an emergency vehicle and trained personnel at the ready about one and a half miles away and capable of responding to the location of the crash on Springfield Highway within less than two minutes.

(7) The City of Greenbrier similarly had an emergency vehicle and trained personnel at the ready a short distance away and capable of responding to the location of the crash on Springfield Highway within less than two minutes.

(8) Despite the ready availability of emergency equipment and personnel who could have responded sooner, personnel of the Defendant Metropolitan Government inexplicably dispatched emergency vehicles and personnel from locations more distant than Ridgetop and Greenbrier, resulting in a longer response time.

(9) While awaiting the arrival of emergency medical personnel, the Plaintiff's decedent was trapped inside his overturned automobile, suspended upside down by his seat belt.

(10) The Plaintiff's decedent was extricated from his vehicle by emergency personnel of the City of Goodlettsville. He had to wait on a stretcher, with life threatening injuries, for several minutes for ambulance personnel of the Defendant Metropolitan Government to transport him to the emergency room at Vanderbilt University Hospital. On information and belief, Mr. Ballentine was conscious and suffering during this waiting time.

---

[4](...continued)
responders in Ridgetop were actually located within the Metro Government's jurisdiction. For purposes of this appeal, we presume that the Ridgetop first responders to whom the complaint refers were located "outside of Davidson County," as found by the trial court.

(11) Despite best efforts of emergency room personnel to treat his injuries, the Plaintiff's decedent died at Vanderbilt Hospital approximately twelve hours after the collision.

Ms. Gregory sought compensatory damages pursuant to the GTLA based on Metro Government's conduct.

In its answer, Metro Government denied liability. Subsequently, Metro Government filed a motion for judgment on the pleadings pursuant to Rule 12.03 of the Tennessee Rules of Civil Procedure,[5] arguing that the complaint should be dismissed on its face. It asserted that Metro Government had no duty to request emergency medical aid from either Ridgetop or Greenbrier, because those municipalities are located in Robertson County. Metro Government took the position that its authority to request assistance from another governmental entity is set out in Tennessee's Mutual Aid and Emergency and Disaster Assistance Agreement Act of 2004 ("the Mutual Aid Act"), Tennessee Code Annotated § 58-8-101, *et seq.*, and contended that the Mutual Aid Act did not authorize Metro Government's 911 operators to solicit aid from Robertson County in this situation. In the alternative, Metro Government argued that its decision on whether to request emergency aid from another government is a discretionary function, for which Metro Government is immune from suit pursuant to Tennessee Code Annotated § 29-20-205(1). In a footnote in its motion for judgment on the pleadings, Metro Government asserted that the public duty doctrine shielded it from liability to the extent that the duty on which the plaintiff relied was a duty to the public at large.

On July 25, 2011, Ms. Gregory filed a response to the motion to dismiss. She argued that the Mutual Aid Act is not the exclusive vehicle through which local governments are permitted to cooperate with one another regarding the provision of emergency services, and that the Act did not preclude Metro Government from seeking assistance from other municipalities in this case. She maintained that her complaint was not based on the Mutual Aid Act, but rather it asserted "a common law claim for negligence . . . ." Metro Government's common-law duty, Ms. Gregory argued, was to exercise reasonable care and to avoid causing foreseeable injury to others. "Even in the absence of a pre-existing duty, one who gratuitously undertakes to act to assist another thereby assumes a duty to exercise reasonable care in so doing." Once the 911 operators answered the bystanders' calls for assistance, she argued, they undertook the duty to exercise reasonable care in responding to those calls. Ms. Gregory claimed that, under the facts as alleged in the complaint, a reasonable trier of fact could have found that the need for a rapid response was necessary, and that the 911 operator's failure to call the

---

[5]A motion for judgment on the pleadings may be filed "[a]fter the pleadings are closed but within such time as not to delay the trial." Tenn. R. Civ. P. 12.03.

nearest first responders was negligent and/or reckless.[6]  Furthermore, she argued, it cannot be determined from the four corners of the complaint whether discretionary-function immunity shields Metro Government from liability in this case.  Finally, she contended that the public duty doctrine does not shield Metro Government from liability, because this case falls within the special-duty exception to the doctrine.  Ms. Gregory argued that, for these reasons, the trial court should have denied the motion.

On July 29, 2011, the trial court held a hearing on Metro Government's motion for judgment on the pleadings.[7]  On August 18, 2011, the trial court entered an order granting the motion and dismissing the complaint on its face.  The trial court held that "the Metropolitan Government had no duty to request emergency medical aid from personnel outside of Davidson County, such as those from the City of Ridgetop or City of Greenbrier, when it responded to the May 30, 2010 accident."  In addition, the trial court concluded that "the decision to request or not request emergency medical aid from another government is a discretionary function, for which the Metropolitan Government is immune pursuant to Tenn. Code Ann. § 29-20-205(1)."  Thus, the trial court granted the motion for judgment on the pleadings and dismissed the case.[8]  From this order, Ms. Gregory now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Ms. Gregory argues that the trial court erred in granting Metro Government's motion for judgment on the pleadings.

The trial court's grant of a motion for judgment on the pleadings is "in effect a [dismissal] for failure to state a claim upon which relief can be granted" pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure.  *Timmins v. Lindsey*, 310 S.W.3d 834, 838 (Tenn. Ct. App. 2009).  Both a Rule 12.03 motion for judgment on the pleadings and a Rule 12.02(6) motion to dismiss for failure to state a claim test the legal sufficiency of the complaint itself. *Id.*; *compare Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011) (Rule 12.02(6)), *with McLenahan v. Cooley*, 806 S.W.2d 767, 769 (Tenn. 1991) (Rule 12.03).  This Court has recently explained:

---

[6]Ms. Gregory did not allege in her complaint that Metro Government's conduct was reckless.

[7]A transcript of that hearing is not included in the appellate record.

[8]The trial court did not rely on the public duty doctrine in reaching its conclusion.

A motion filed pursuant to Tenn. R. Civ. P. 12.02(6) and a motion filed pursuant to Tenn. R. Civ. P. 12.03 both test the legal sufficiency of the complaint itself. Such motions do not test the strength of the plaintiff's proof.

A complaint should not be dismissed pursuant to Rule 12.02(6) or Rule 12.03 unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

The moving party admits the truth of all the relevant and material factual allegations in the complaint for purposes of such a motion, but asserts that no cause of action arises from those facts. A court reviewing a complaint being tested by a Tenn. R. Civ. P. 12.02(6) or 12.03 motion must construe the complaint liberally in favor of the plaintiff by taking all factual allegations in the complaint as true, and by giving the plaintiff the benefit of all the inferences that can be reasonably drawn from the pleaded facts.

On appeal from an order granting a Rule 12.02(6) motion or a Rule 12.03 motion, this court must, like the trial court, presume that the factual allegations in the complaint are true, and we must review the trial court's legal conclusions regarding the adequacy of the complaint *de novo*, with no presumption of correctness.

*Gillham v. City of Mt. Pleasant*, No. M2010-02506-COA-R3-CV, 2012 WL 1079333, at *5 (Tenn. Ct. App. Mar. 29, 2012) (citations omitted).

Thus, in conducting our review of the trial court's decision, we are confined to the well-pleaded facts in the complaint, and we give Ms. Gregory the benefit of all inferences that can reasonably be drawn from those facts. *Timmins*, 310 S.W.3d at 838-39. Our review of the trial court's grant of judgment on the pleadings is *de novo*, with no presumption of correctness in the trial court's decision. *Id.*

## ANALYSIS

Ms. Gregory's primary argument is that the trial court erred in determining that Metro Government had no duty to request emergency medical aid from personnel outside of Davidson County when it responded to the 911 calls related to the decedent's accident. We consider this argument first.

Ms. Gregory first notes the well-settled principle that all persons have a broad duty to exercise reasonable care to avoid causing foreseeable injury to others. Even in the absence

of a pre-existing legal duty, she contends, the Metro Government 911 operator undertook to summon help in response to the 911 calls, and the operator thereby assumed the duty to exercise reasonable care in deciding which first responders to call for aid. In response, Metro Government argues that the trial court correctly concluded that it had no duty to summon aid from emergency personnel outside its jurisdiction. It claims that the Mutual Aid Act does not authorize Metro Government to request such aid from other jurisdictions for this type of accident. Even if it did, Metro Government argues, public policy considerations militate against imposing a duty on Metro Government to do so under these circumstances.

In general, the GTLA provides that governmental entities, such as Metro Government, are immune from suit unless Tennessee's legislature has, by statute, removed that immunity. *See* Tenn. Code Ann. §29-20-201 (2012); *Autry v. Hooker,* 304 S.W.3d 356, 362 (Tenn. Ct. App. 2009); *see also Fretwell v. Chaffin*, 652 S.W.2d 755, 756 (Tenn. 1983); *Brown v. Hamilton County*, 126 S.W.3d 43, 46 (Tenn. Ct. App. 2003). The GTLA removes the immunity for governmental entities as to lawsuits for injuries caused by the negligent act or omission of an employee, with certain enumerated exceptions. Tenn. Code Ann. § 29-20-205 (2012); *Autry,* 304 S.W.3d at 362. One such exception is when "the injury arises out of . . . the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." *Id.* at § 29-20-205(1).

The instant lawsuit is based on a claim of common-law negligence against Metro Government. The elements of a negligence claim are (1) a duty of care, (2) breach of the duty of care, (3) injury or loss, (4) cause in fact, and (5) proximate or legal cause. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Rathnow v. Knox County*, 209 S.W.3d 629, 633 (Tenn. Ct. App. 2006). The focus of our analysis is on the "duty of care" element. "Properly defined, duty is the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *McCall*, 913 S.W.2d at 153. "Determining the existence and extent of one person's duty to another is a question of law to be decided by the courts."[9] *GuestHouse Int'l v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 195 (Tenn. Ct. App. 2010).

Under general negligence principles, a person who undertakes to render services for another may be liable for personal injury caused to the other by the failure to exercise reasonable care. This precept is described in the Restatement (Second) of Torts:

---

[9]In some situations, the nature of a defendant's duty depends on the resolution of certain factual issues. *See Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 821 (Tenn. 2008). In this case, the facts as stated in the complaint are taken as true. Therefore, the issue of whether a duty exists on the facts as stated in the complaint is a question of law.

One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . ., is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or

> (b) he has undertaken to perform a duty owed by the other to the third person, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).[10]

With these principles in mind, we consider whether the Metro Government's duty to use reasonable care in assisting the decedent included the duty to summon aid from first responders in Robertson County, who were closer to the accident site than the first responders in Davidson County.[11] The parties have cited no Tennessee case directly addressing this issue, and we have found none. Therefore, it appears that this is an issue of first impression in Tennessee. When presented with an issue of first impression, we look to cases from other jurisdictions for guidance. *State v. Munn*, 56 S.W.3d 486, 495 (Tenn. 2001).

In support of her argument that Metro Government had a duty to the decedent in this case, Ms. Gregory cites a case out of New York, *DeLong v. County of Erie*, 89 A.D.2d 376, 377

---

[10]Section 324A of the Restatement has been cited and relied upon in cases addressing the liability of a person for a breach of the assumed duty of reasonable care. *See Lynch v. Loudon County*, No. E2010-02231-COA-R3-CV, 2011 WL 4952778, at *6 (Tenn. Ct. App. Oct. 14, 2011), *perm. app. denied* (Feb. 15, 2012); *Dyer v. Hill Servs. Plumbing & HVAC*, No. W2009-00687-COA-R3-CV, 2010 WL 27877, at *7-8 & n.4 (Tenn. Ct. App. Jan. 7, 2010); *Barron v. Emerson Russell Maint. Co.*, No. W2008-01409-COA-R3-CV, 2009 WL 2340990, at *7-8 & n.5 (Tenn. Ct. App. July 30, 2009) (citing *Biscan v. Brown*, 160 S.W.3d 462, 483 (Tenn. 1994); *Speaker v. Cates Co.*, 879 S.W.2d 811, 813 (Tenn.1994); *Collins v. Arnold*, No. M2004-02513-COA-R3-CV, 2007 WL 4146025, at * 14 (Tenn. Ct. App. Nov. 20, 2007)).

[11]Ms. Gregory does not allege in her complaint that the decedent received inadequate care from Metro Government's emergency personnel at the scene of the accident or that their arrival to the accident site was unreasonably delayed. She alleges only that Metro Government was negligent in "dispatch[ing] emergency vehicles and personnel from locations more distant than Ridgetop and Greenbrier, resulting in a longer response time."

(N.Y. App. Div. 1982).   In **DeLong,** the city and county were sued for negligence in responding to an emergency 911 call about an intruder at a home.  After receiving the call, the 911 operator sent the emergency personnel to the wrong address.  During the delay caused by the 911 operator's error, the decedent was stabbed to death by the intruder.  The decedent's representative filed a wrongful death lawsuit, and the case was tried before a jury. The jury determined that the municipalities were liable for the decedent's death based on the negligent response to the 911 call.  **DeLong**, 89 A.D.2d at 377.  The appellate court upheld the verdict, concluding that the municipalities owed a duty to the decedent because they undertook to assist her during the emergency.   The court reasoned that while the establishment of the 911 emergency call system did not create the duty,   "[i]t is the holding out of the 911 number as one to be called by someone in need of assistance . . . .  This voluntary assumption of a duty to act carried with it the obligation to act with reasonable care."  **Id.** at 384 (citations omitted).

Ms. Gregory also cites a Tennessee case, **Lindsey v. Miami Development Corp.**, 689 S.W.2d 856 (Tenn. 1985).   In that case, the decedent jumped off a balcony at the defendant's residence.  After the decedent jumped, the defendant told those gathered around to "wait a while before you call an ambulance."  **Lindsey**, 689 S.W.2d at 858.  The decedent died because of the delay in medical care after the accident, and the decedent's representative filed a wrongful death lawsuit against the defendant residence owner.  The trial court granted summary judgment in favor of the defendant, holding that he owed no duty to render aid to the decedent.  The Supreme Court of Tennessee reversed, concluding that the defendant owed a duty to the decedent because the defendant stood in a special relationship with the decedent, as host and social guest.  Beyond that holding, the Court also stated: "[E]ven if no relationship had existed between [the decedent] and the Defendant, the Defendant assumed control of the situation which placed him under the obligation to exercise reasonable care to render aid to [the decedent]."  **Id.** at 860.

Relying on both **DeLong** and **Lindsey,** Ms. Gregory argues that, by undertaking to assist the decedent, Metro Government's 911 operator assumed the duty to act with reasonable care in responding to the calls.  She claims that the operator's failure to summon the assistance of the closest first responders was the "functional equivalent of directing others to 'wait a while before you call an ambulance,'" as in the case of **Lindsey**.  Under these circumstances, Ms. Gregory argues, Metro Government had a duty of reasonable care to the decedent, and a reasonable trier of fact could find that the duty was breached by the failure to summon the closest first responders, even if outside the jurisdiction.

In response to Ms. Gregory's argument, Metro Government claims, as it did in the trial court, that its duty to work with other local governments in rendering emergency aid is governed by the Mutual Aid Act.  The Mutual Aid Act addresses the manner in which governmental

entities may enter into agreements to provide mutual assistance in the event of an "occurrence." An "occurrence" is defined as "the imminent threat of an event or an actual event and its aftermath, whether natural or man-made, that could lead to substantial bodily injury or property damage and that could lead to the declaration of a state of emergency."[12] Tenn. Code Ann. § 58-8-102(9) (Supp. 2012). The Act provides that, in the event of an "occurrence," the governmental entity may request aid outside its jurisdiction:

> (a) When a governmental entity is affected by an occurrence that its resources will not be adequate to handle, the governmental entity may request aid through the appropriate emergency management employee or official, or a county or municipality may declare a local state of emergency as provided in § 58-8-104 and request assistance by communicating the request to a potential responding party or multiple potential responding parties. Requests for aid or for assistance must be made by the appropriate official or employee to the emergency communications dispatch center of potential responding parties or other officials authorized by the potentially responding party to respond to requests under this chapter.

*Id.* § 58-8-105(a) (Supp. 2012). The Act states specifically that it does not create a duty on participating governments to respond to any requests for aid, and that the responding governments retain the discretion over whether and to what extent to give the aid requested. *See id.* § 58-8-107(a) (Supp. 2012) ("This chapter does not create a duty on participating governmental entities to respond to a request for aid or assistance nor to stay at the scene of an occurrence or emergency for any length of time."). The express purpose of the legislation is "to authorize mutual aid and to enhance public safety and homeland security by facilitating assistance among governmental entities in any state of emergency or declared disaster while conforming to federal guidelines relative to reimbursement costs for assistance rendered." *Id.* at 58-8-103(c) (Supp. 2012). Metro Government notes that Section 58-8-105 of the Mutual Aid Act provides the default rules governing the request for and receipt of aid among local governments. It gives authority to request aid only in the event of a flood, earthquake, tornado, or other type of "occurrence."[13] Because the Act includes no provision for

---

[12]In a somewhat circular fashion, an "emergency" is defined in the Act as an occurrence or threat of an occurrence that actually results in a declaration of a state of emergency. *Id.* at § 58-8-102(5).

[13]At oral argument, Metro Government pointed out that, on May 10, 2011, after the appellate briefs were filed in this case, the General Assembly adopted amendments to the Mutual Aid Act to include specific authority to request and provide aid in less serious situations. Section 58-8-105 was amended to add paragraph (e), which specifically authorizes counties to request such aid "from the emergency communications dispatch center" of a contiguous county for an occurrence that does not involve life-
(continued...)

requesting aid from other governments in less serious situations, Metro Government contends, then it did not authorize Metro Government to request aid or assistance from another local government under the circumstances in this case. Even if it *were* authorized to request aid outside its jurisdiction in this case, Metro Government argues, any decision regarding whether to do so would be discretionary, not mandatory.

In reply to this argument, Ms. Gregory maintains that the language in the Mutual Aid Act is not determinative of Metro Government's duty in this situation. She claims that, even assuming that Metro Government and Robertson County had no written agreement to provide each other mutual aid,[14] this did not preclude the Metro Government 911 operator from summoning help from Robertson County in this case. She emphasizes that the complaint did not allege the breach of any *statutory* duty; rather, it asserted "a common law claim for negligence." Therefore, she argues, regardless of the language in the Mutual Aid Act, this Court must recognize that the Metro Government 911 operator had a common-law duty to summon aid from the nearest responders under the facts in this case.

We agree that the Mutual Aid Act is not determinative of the issue presented here. The Act does not *preclude* a 911 operator in one county from summoning aid from the emergency communications dispatch center in another county, regardless of whether there is a written mutual aid agreement between the two local governments. Metro Government's argument

---

[13](...continued)
threatening injuries:

> (e) . . . [A] governmental entity is authorized to request mutual aid for emergency medical services provided under Title 68, Chapter 140, from the emergency communications dispatch center of a county that is contiguous to the requesting county or governmental entity for occurrences that involve serious injuries or possible loss of life in instances that might not reasonably lead to a declared emergency.

As a corollary, Section 58-8-107 was amended to allow a governmental entity to respond to a request for aid made under this new subsection, and also to specifically authorize counties to "permit routine and automatic approval of and response to such requests." *See* 2012 Tenn. Laws Pub. Ch. 906 (S.B. 68), 2012 Session of the 107th Gen. Assembly. These provisions, of course, were not in effect during the pertinent time period in this appeal. We express no opinion on whether in what ways this amendment would change our analysis or the outcome of this appeal.

[14]Tennessee statutes authorize local governments to enter into mutual aid agreements. *See, e.g.,* Tenn. Code Ann. § 6-54-307 (police department services); § 6-54-601 (fire department services). The recent amendments to the Mutual Aid Act also reference such agreements. The complaint in this case, however, made no reference to any such agreement between Metro Government and Robertson County. As we are addressing Metro Government's motion for judgment on the pleadings, we consider only the facts alleged in the complaint.

relies on a negative inference from the language in the Mutual Aid Act specifically authorizing a governmental entity to request aid in the event of an "occurrence." It argues, in effect, that by authorizing a request for assistance in the event of an "occurrence," the Act precludes a governmental entity from requesting aid in a less emergent situation. We decline to draw such a negative inference from the language in the Mutual Aid Act. The purpose of the legislation is to "enhance public safety" and to "facilitate assistance among governmental entities," so interpreting the Act to preclude a governmental entity from requesting aid from another such entity would be antithetical to that purpose. *Id.* at § 58-8-103(c).

By the same token, the Act does not *require* Metro Government to request aid from a neighboring county in any given situation. Rather, the legislation outlines how local governments may enter into agreements in advance of an emergency in a way that will be mutually beneficial, and it is based on the premise that aid between local governments should be the result of negotiation and cooperation. The permissive language in the Act indicates that the government from which aid is requested has sole discretion over whether to provide aid to the requesting government and the extent of any such aid that may be provided. *Id.* at § 58-8-107. Considering the Mutual Aid Act as a whole, we find that the Act neither required Metro Government to request aid from outside its jurisdiction nor precluded Metro Government from doing so. Thus, the Mutual Aid Act is not dispositive of the issues presented in this appeal.

Because the question of Metro Government's duty is not resolved by reference to the Mutual Aid Act, we go on to consider whether Metro Government had a common-law duty to summon aid from neighboring Robertson County under the facts in this case. "In any action grounded in negligence, the existence or nonexistence of a duty . . . 'is entirely a question of law, to be determined by reference to the body of statutes, rules, principles, and precedents which make up the law.'" *Dill v. Gamble Asphalt Materials*, 594 S.W.2d 719, 721 (Tenn. Ct. App. 1979) (citing W. Prosser, Law of Torts, § 37 (4ᵗʰ ed. 1971)). The Tennessee Supreme Court has outlined the process for determining whether a common law duty exists:

> In most cases today, prior court decisions and statutes have already established the doctrines and rules governing a defendant's conduct. Generally, the presence or absence of a duty is a given rather than a matter of reasoned debate, discussion, or contention. The common law, however, must and does grow to accommodate new societal realities and values—or simply better reasoning—as it moves toward refinement and modification with the aim of improving while maintaining a sufficient stability so as to seek, and one hopes, to find, prudent reformation as opposed to anarchic revolution. When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public

policy for guidance. Doing so necessarily favors imposing a duty of reasonable care where a "defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property." *McCall v. Wilder*, 913 S.W.2d at 153. When conducting this analysis, the courts have considered, among other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct. *Burroughs v. Magee*, 118 S.W.3d at 329; *McCall v. Wilder*, 913 S.W.2d at 153.

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008) (footnote omitted).

The California case of *Dragoo v. Niland Fire District of Imperial County*, cited by Metro Government, discusses the public policy concerns at issue in analyzing the question of duty under circumstances such as those presented in this case.[15] *Dragoo v. Niland Fire Dist. of Imperial County*, No. D057565, 2011 WL 3299930 (Cal. 4th Dist. Ct. App. Aug. 2, 2011). In *Dragoo*, the Niland Fire District received a 911 call indicating that a victim was being attacked by a swarm of Africanized bees.[16] Although the Niland Fire District had a mutual aid agreement with the Calipatria Fire District, the Niland Fire District did not initially seek the assistance of the Calipatria Fire District in response to the emergency. Instead, several Niland Fire District personnel responded to the call. They did not, however, bring appropriate equipment, and they too were attacked and disabled by the swarm of bees. Finally, the Niland Fire District contacted the Calipatria Fire District, which responded to aid both the initial victim and the injured Niland emergency personnel. The victim later died from the bee attack. *Id.* at *1.

The victim's representative filed a lawsuit against the Niland Fire District, asserting negligence. The Niland Fire District sought dismissal of the complaint, alleging that it owed no duty to even respond to the 911 call, and therefore it had no duty to render aid to the victim or to call another fire department to provide such aid. *Id.* In response, the plaintiff

---

[15]The *Dragoo* case is designated as "Nonpublished/Noncitable" under California law. We are mindful of this designation, but consider as persuasive the *Dragoo* Court's discussion of the somewhat unique policy considerations presented in the instant case.

[16]Africanized bees, sometimes referred to as "killer bees," are known to be unusually aggressive.

argued that the Niland Fire District, by undertaking to assist the victim, created a special relationship with the victim, thereby creating a duty to the victim. The trial court granted the motion to dismiss, and the plaintiff appealed. *Id.*

The appellate court in ***Dragoo*** addressed the issue of whether a local government has the duty to use all available resources in responding to a 911 call. *Id.* at \*3. The California court recognized that, under California jurisprudence, every person has a duty to exercise ordinary care, and the issue was whether consideration of numerous applicable factors "justifies an exemption from the general duty of care for the class of actors to which the defendant belonged." ***Dragoo***, 2001 WL 3299930, at \*2. In addressing the issue, the ***Dragoo*** court considered a number of public policy considerations, including:

> . . . the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the mortal blame attached to the defendant's conduct, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for the breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.* at \*2 (quoting ***Cabral v. Ralphs Grocery Co.***, 51 Cal. 4th 764, 771 (2011) (citations omitted)). The court clarified that the issue was a broad one; it did not consider whether the factors supported an exception to the general duty of reasonable care under the facts of the particular case, but instead whether they "justif[ied] carving out an entire category of cases from that general duty rule . . . ." *Id.* (quoting ***Cabral***, 51 Cal. 4th at 772). This distinction was made to "preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." *Id.* (quoting ***Cabral***, 51 Cal. 4th at 772 (emphasis in original)).

The ***Dragoo*** court found that the relevant factors weighed in favor of holding that the Niland Fire District's duty of care did not include the decision of whether to respond to the 911 call with every available resource:

> We do not believe that, whenever a 911 call is received, the decision to employ less than every available resource is sufficiently likely to result in the exacerbation of the plight of the person in peril so that liability may appropriately be imposed if emergency responders do not commit all available resources to every call. Deciding to send every available responder may provide some incrementally *better* response in some cases, but as a general

rule the decision to send fewer responders is not sufficiently likely to result in *worsening* the plight of the victim so that liability may appropriately be imposed.

*Id.* at \*3 (emphasis in original). The appellate court also held that other public policy considerations weighed in favor of immunizing first responders from liability for responding to 911 calls with fewer than all of the available resources:

> The policy of preventing future harm, the extent of the burden to the defendant, and consequences to the community if rescuers must devote all available resources to respond to a 911 call (to insure they will not face liability for responding to that call) also militate in favor of creating a duty "exception" which immunizes rescuers from liability when they respond to 911 calls with fewer than all available resources. First, it would discourage emergency personnel from responding to 911 calls *at all* unless they could accurately predict, *in advance of responding to the call*, that a limited team could respond and achieve the best possible result for the victim. Absent such a guarantee, emergency responders could only be assured of immunity from liability by (1) ignoring the call (because there is no duty to respond) or (2) committing *all* available resources to responding to the call (to avoid the retrospective arguments that some other response with more personnel would have been more effective). (Cf. *Williams, supra*, 34 Cal.3d at p. 30 (conc. and dis. opn. of Mosk, J.) ["No matter which of the several alternatives [the emergency responders] selected, someone could persuasively argue that another [alternative was better]. This scenario lends itself to typical Monday-morning quarterbacking."].)

*Id.* at \*5 (emphasis in original; footnote omitted). Thus, the appellate court held that imposing a duty on a governmental entity to enlist all available resources in any given situation would result in either a choice not to respond to 911 calls at all, unless they could predict that a limited team could achieve the best result, or a choice to commit all available resources to every call, in order to avoid potential liability. Such a ruling, the court observed, would invite "Monday-morning quarterbacking" that would ultimately create negative consequences to the community. *See id.* (quoting *Williams v. State of California*, 664 P.2d 137, 144 (Cal. 1983) (Mosk, J., concurring and dissenting)).

We agree with the analysis of the public policy considerations discussed in *Dragoo.* Allowing courts to second-guess a governmental entity's decisions on whether to commit any and all available public resources in a given situation would ultimately cripple the governmental entity's ability to effectively marshal limited resources and personnel. Under

the facts in this case, we hold that Metro Government did not have a duty to request the assistance of emergency responders from Robertson County. On this basis, we affirm the trial court's decision to grant Metro Government's motion for judgment on the pleadings.

This holding pretermits all other issues raised on appeal, including the issues involving discretionary-function immunity and the public duty doctrine.

### CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Lori Gregory and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE